# NATIONAL LABOR RELATIONS BOARD *v.* CATHOLIC BISHOP OF CHICAGO ET AL.

No. 77-752.   Argued October 30, 1978—Decided March 21, 1979

BURGER, C. J., delivered the opinion of the Court, in which STEWART, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a

dissenting opinion, in which WHITE, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 508.

*Solicitor General McCree* argued the cause for petitioner. With him on the briefs were *Kenneth S. Geller, John S. Irving, Carl L. Taylor, Norton J. Come,* and *Carol A. De Deo.*

*Don H. Reuben* argued the cause for respondents. With him on the brief were *Lawrence Gunnels, James A. Serritella, James A. Klenk,* and *Jerome J. O'Dowd.**

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

This case arises out of the National Labor Relations Board's exercise of jurisdiction over lay faculty members at two groups of Catholic high schools. We granted certiorari to consider two questions: (a) Whether teachers in schools operated by a church to teach both religious and secular subjects are within the jurisdiction granted by the National Labor Relations Act; and (b) if the Act authorizes such jurisdiction, does its exercise violate the guarantees of the Religion Clauses of the First Amendment? 434 U. S. 1061 (1978).

---

*\* J. Albert Woll* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Leo Pfeffer* and *Earl W. Trent, Jr.,* for the Baptist Joint Committee on Public Affairs; by *Thomas Stephen Neuberger* for the Center for Law and Religious Freedom of the Christian Legal Society; by *Warren L. Johns, Walter E. Carson, Lee Boothby,* and *Robert J. Hickey* for the General Conference of Seventh-Day Adventists; and by *David Goldberger* and *Barbara P. O'Toole* for the Roger Baldwin Foundation of the American Civil Liberties Union, Inc., Illinois Division.

Briefs of *amici curiae* were filed by *Lawrence A. Poltrock* and *Bruce E. Endy* for the American Federation of Teachers (AFL–CIO); by *Sharp Whitmore* for certain Catholic High Schools in the Archdiocese of Los Angeles and the Diocese of Orange; and by *George E. Reed* and *Patrick F. Geary* for the United States Catholic Conference.

## I

One group of schools is operated by the Catholic Bishop of Chicago, a corporation sole; the other group is operated by the Diocese of Fort Wayne-South Bend, Inc. The group operated by the Catholic Bishop of Chicago consists of two schools, Quigley North and Quigley South.[1] Those schools are termed "minor seminaries" because of their role in educating high school students who may become priests. At one time, only students who manifested a positive and confirmed desire to be priests were admitted to the Quigley schools. In 1970, the requirement was changed so that students admitted to these schools need not show a definite inclination toward the priesthood. Now the students need only be recommended by their parish priest as having a potential for the priesthood or for Christian leadership. The schools continue to provide special religious instruction not offered in other Catholic secondary schools. The Quigley schools also offer essentially the same college-preparatory curriculum as public secondary schools. Their students participate in a variety of extracurricular activities which include secular as well as religious events. The schools are recognized by the State and accredited by a regional educational organization.[2]

The Diocese of Fort Wayne-South Bend, Inc., has five high schools.[3] Unlike the Quigley schools, the special recom-

---

[1] The Catholic Bishop operates other schools in the Chicago area, but they were not involved in the proceedings before the Board.

[2] As explained to the Board's Hearing Officer, in Illinois the term "approval" is distinct from "recognition." Before a school may operate, it must be approved by the State's Department of Education. Approval is given when a school meets the minimal requirements under state law, such as for compulsory attendance; approval does not require any evaluation of the school's program. Recognition, which is not required to operate, is given only after the school has passed the State's evaluation.

[3] The Diocese also has 47 elementary schools. They were not involved in the proceedings before the Board.

mendation of a priest is not a prerequisite for admission. Like the Quigley schools, however, these high schools seek to provide a traditional secular education but oriented to the tenets of the Roman Catholic faith; religious training is also mandatory. These schools are similarly certified by the State.[4]

In 1974 and 1975, separate representation petitions were filed with the Board by interested union organizations for both the Quigley and the Fort Wayne-South Bend schools; representation was sought only for lay teachers.[5] The schools challenged the assertion of jurisdiction on two grounds: (a) that they do not fall within the Board's discretionary jurisdictional criteria; and (b) that the Religion Clauses of the First Amendment preclude the Board's jurisdiction. The Board rejected the jurisdictional arguments on the basis of its decision in *Roman Catholic Archdiocese of Baltimore,* 216 N. L. R. B. 249 (1975). There the Board explained that its policy was to decline jurisdiction over religiously sponsored organizations "only when they are completely religious, not just religiously associated." *Id.,* at 250. Because neither group of schools was found to fall within the Board's "completely religious" category, the Board ordered elections. *Catholic Bishop of Chicago,* 220 N. L. R. B. 359 (1975).[6]

---

[4] As explained to the Board's Hearing Officer, "certification" by the State of Indiana is roughly equivalent to "recognition" by the State of Illinois. Both are voluntary procedures which involve some evaluation by the state educational authorities.

[5] The certification and order cover only "all full-time and regular part-time lay teachers, including physical education teachers . . . ; and excluding rectors, procurators, dean of studies, business manager, director of student activities, director of formation, director of counseling services, office clerical employees, maintenance employees, cafeteria workers, watchmen, librarians, nurses, all religious faculty, and all guards and supervisors as defined in the Act . . . ." *Catholic Bishop of Chicago,* 220 N. L. R. B. 359, 360 (1975).

[6] The decision concerning the Diocese of Fort Wayne-South Bend, Inc., is not reported.

In the Board-supervised election at the Quigley schools, the Quigley Education Alliance, a union affiliated with the Illinois Education Association, prevailed and was certified as the exclusive bargaining representative for 46 lay teachers. In the Diocese of Fort Wayne-South Bend, the Community Alliance for Teachers of Catholic High Schools, a similar union organization, prevailed and was certified as the representative for the approximately 180 lay teachers. Notwithstanding the Board's order, the schools declined to recognize the unions or to bargain. The unions filed unfair labor practice complaints with the Board under §§ 8 (a)(1) and (5) of the National Labor Relations Act, 49 Stat. 452, as amended, 29 U. S. C. §§ 158 (a) (1) and (5). The schools opposed the General Counsel's motion for summary judgment, again challenging the Board's exercise of jurisdiction over religious schools on both statutory and constitutional grounds.

The Board reviewed the record of previous proceedings and concluded that all of the arguments had been raised or could have been raised in those earlier proceedings. Since the arguments had been rejected previously, the Board granted summary judgment, holding that it had properly exercised its statutory discretion in asserting jurisdiction over these schools.[7] The Board concluded that the schools had violated the Act and ordered that they cease their unfair labor practices and that they bargain collectively with the unions. *Catholic*

---

[7] The Board relied on its reasoning in *Cardinal Timothy Manning, Roman Catholic Archbishop of the Archdiocese of Los Angeles,* 223 N. L. R. B. 1218 (1976): "We also do not agree that the schools are religious institutions intimately involved with the Catholic Church. It has heretofore been the Board's policy to decline jurisdiction over institutions only when they are completely religious, not just religiously associated. *Roman Catholic Archdiocese of Baltimore, Archdiocesan High Schools,* 216 NLRB 249 (1975). The schools perform in part the secular function of educating children, and in part concern themselves with religious instruction. Therefore, we will not decline to assert jurisdiction over these schools on such a basis." 223 N. L. R. B., at 1218.

*Bishop of Chicago,* 224 N. L. R. B. 1221 (1976); *Diocese of Fort Wayne-South Bend, Inc.,* 224 N. L. R. B. 1226 (1976).

## II

The schools challenged the Board's orders in petitions to the Court of Appeals for the Seventh Circuit. That court denied enforcement of the Board's orders. 559 F. 2d 1112 (1977).[8] The court considered the Board's actions in relation to its discretion in choosing to extend its jurisdiction only to religiously affiliated schools that were not "completely religious." It concluded that the Board had not properly exercised its discretion, because the Board's distinction between "completely religious" and "merely religiously associated" failed to provide a workable guide for the exercise of discretion:

> "We find the standard itself to be a simplistic black or white, purported rule containing no borderline demarcation of where 'completely religious' takes over or, on the other hand, ceases. In our opinion the dichotomous 'completely religious—merely religiously associated' standard provides no workable guide to the exercise of discretion. The determination that an institution is so completely a religious entity as to exclude any viable secular components obviously implicates very sensitive questions of faith and tradition. *See, e. g.,* [*Wisconsin* v.] *Yoder,* . . . 406 U. S. 205 [(1972)]." *Id.,* at 1118.

The Court of Appeals recognized that the rejection of the Board's policy as to church-operated schools meant that the Board would extend its jurisdiction to all church-operated

---

[8] Cf. *Caulfield* v. *Hirsch,* 95 LRRM 3164 (ED Pa. 1977) (enjoining Board from asserting jurisdiction over elementary schools in Archdiocese of Philadelphia). This case is presently under review by the Court of Appeals for the Third Circuit. See App. to Pet. for Cert. in *Caulfield* v. *Hirsch,* O. T. 1977, No. 77–1411, p. A76, cert. denied, 436 U. S. 957 (1978).

schools. The court therefore turned to the question of whether the Board could exercise that jurisdiction, consistent with constitutional limitations. It concluded that both the Free Exercise Clause and the Establishment Clause of the First Amendment foreclosed the Board's jurisdiction. It reasoned that from the initial act of certifying a union as the bargaining agent for lay teachers the Board's action would impinge upon the freedom of church authorities to shape and direct teaching in accord with the requirements of their religion. It analyzed the Board's action in this way:

"At some point, factual inquiry by courts or agencies into such matters [separating secular from religious training] would almost necessarily raise First Amendment problems. If history demonstrates, as it does, that Roman Catholics founded an alternative school system for essentially religious reasons and continued to maintain them as an 'integral part of the religious mission of the Catholic Church,' Lemon [v. Kurtzman, 403 U. S. 602], 616 [(1971)], courts and agencies would be hard pressed to take official or judicial notice that these purposes were undermined or eviscerated by the determination to offer such secular subjects as mathematics, physics, chemistry, and English literature." Ibid.

The court distinguished local regulations which required fire inspections or state laws mandating attendance, reasoning that they did not "have the clear inhibiting potential upon the relationship between teachers and employers with which the present Board order is directly concerned." Id., at 1124. The court held that interference with management prerogatives, found acceptable in an ordinary commercial setting, was not acceptable in an area protected by the First Amendment. "The real difficulty is found in the chilling aspect that the requirement of bargaining will impose on the exercise of the bishops' control of the religious mission of the schools." Ibid.

## III

The Board's assertion of jurisdiction over private schools is, as we noted earlier, a relatively recent development. Indeed, in 1951 the Board indicated that it would not exercise jurisdiction over nonprofit, educational institutions because to do so would not effectuate the purposes of the Act. *Trustees of Columbia University in the City of New York,* 97 N. L. R. B. 424. In 1970, however, the Board pointed to what it saw as an increased involvement in commerce by educational institutions and concluded that this required a different position on jurisdiction. In *Cornell University,* 183 N. L. R. B. 329, the Board overruled its *Columbia University* decision. *Cornell University* was followed by the assertion of jurisdiction over nonprofit, private secondary schools. *Shattuck School,* 189 N. L. R. B. 886 (1971). See also *Judson School,* 209 N. L. R. B. 677 (1974). The Board now asserts jurisdiction over all private, nonprofit, educational institutions with gross annual revenues that meet its jurisdictional requirements whether they are secular or religious. 29 CFR § 103.1 (1978). See, *e. g., Academia San Jorge,* 234 N. L. R. B. 1181 (1978) (advisory opinion stating that Board would not assert jurisdiction over Catholic educational institution which did not meet jurisdictional standards); *Windsor School, Inc.,* 199 N. L. R. B. 457, 200 N. L. R. B. 991 (1972) (declining jurisdiction where private, proprietary school did not meet jurisdictional amounts).

That broad assertion of jurisdiction has not gone unchallenged. But the Board has rejected the contention that the Religion Clauses of the First Amendment bar the extension of its jurisdiction to church-operated schools. Where the Board has declined to exercise jurisdiction, it has done so only on the grounds of the employer's minimal impact on commerce. Thus, in *Association of Hebrew Teachers of Metropolitan Detroit,* 210 N. L. R. B. 1053 (1974), the Board did not assert jurisdiction over the Association which offered

courses in Jewish culture in after-school classes, a nursery school, and a college. The Board termed the Association an "isolated instance of [an] atypical employer." *Id.*, at 1058–1059. It explained: "Whether an employer falls within a given 'class' of enterprise depends upon those of its activities which are predominant and give the employing enterprise its character. . . . [T]he fact that an employer's activity . . . is dedicated to a sectarian religious purpose is not a sufficient reason for the Board to refrain from asserting jurisdiction." *Id.*, at 1058. Cf. *Board of Jewish Education of Greater Washington, D. C.*, 210 N. L. R. B. 1037 (1974). In the same year the Board asserted jurisdiction over an Association chartered by the State of New York to operate diocesan high schools. *Henry M. Hald High School Assn.*, 213 N. L. R. B. 415 (1974). It rejected the argument that its assertion of jurisdiction would produce excessive governmental entanglement with religion. In the Board's view, the Association had chosen to entangle itself with the secular world when it decided to hire lay teachers. *Id.*, at 418 n. 7.[9]

When it ordered an election for the lay professional employees at five parochial high schools in Baltimore in 1975, the Board reiterated its belief that exercise of its jurisdiction is not contrary to the First Amendment:

"[T]he Board's policy in the past has been to decline jurisdiction over similar institutions only when they are completely religious, not just religiously associated, and the Archdiocese concedes that instruction is not limited to religious subjects. That the Archdiocese seeks to provide an education based on Christian principles does not lead to a contrary conclusion. Most religiously associated institutions seek to operate in conformity with

---

[9] The Board went on to explain that the rights guaranteed by § 7 of the Act, 29 U. S. C. § 157, were "a part of our national heritage established by Congress, [and] were a legitimate exercise of Congress' constitutional power." 213 N. L. R. B., at 418 n. 7.

their religious tenets." *Roman Catholic Archdiocese of Baltimore*, 216 N. L. R. B., at 250.

The Board also rejected the First Amendment claims in *Cardinal Timothy Manning, Roman Catholic Archbishop of the Archdiocese of Los Angeles*, 223 N. L. R. B. 1218, 1218 (1976): "Regulation of labor relations does not violate the First Amendment when it involves a *minimal intrusion* on religious conduct and is necessary to obtain [the Act's] objective." (Emphasis added.)

The Board thus recognizes that its assertion of jurisdiction over teachers in religious schools constitutes some degree of intrusion into the administration of the affairs of church-operated schools. Implicit in the Board's distinction between schools that are "completely religious" and those "religiously associated" is also an acknowledgment of some degree of entanglement. Because that distinction was measured by a school's involvement with commerce, however, and not by its religious association, it is clear that the Board never envisioned any sort of religious litmus test for determining when to assert jurisdiction. Nevertheless, by expressing its traditional jurisdictional standards in First Amendment terms, the Board has plainly recognized that intrusion into this area could run afoul of the Religion Clauses and hence preclude jurisdiction on constitutional grounds.

## IV

That there are constitutional limitations on the Board's actions has been repeatedly recognized by this Court even while acknowledging the broad scope of the grant of jurisdiction. The First Amendment, of course, is a limitation on the power of Congress. Thus, if we were to conclude that the Act granted the challenged jurisdiction over these teachers we would be required to decide whether that was constitutionally permissible under the Religion Clauses of the First Amendment.

Although the respondents press their claims under the Religion Clauses, the question we consider first is whether Congress intended the Board to have jurisdiction over teachers in church-operated schools. In a number of cases the Court has heeded the essence of Mr. Chief Justice Marshall's admonition in *Murray* v. *The Charming Betsy,* 2 Cranch 64, 118 (1804), by holding that an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available. Moreover, the Court has followed this policy in the interpretation of the Act now before us and related statutes.

In *Machinists* v. *Street,* 367 U. S. 740 (1961), for example, the Court considered claims that serious First Amendment questions would arise if the Railway Labor Act were construed to allow compulsory union dues to be used to support political candidates or causes not approved by some members. The Court looked to the language of the Act and the legislative history and concluded that they did not permit union dues to be used for such political purposes, thus avoiding "serious doubt of [the Act's] constitutionality." *Id.,* at 749.

Similarly in *McCulloch* v. *Sociedad Nacional de Marineros de Honduras,* 372 U. S. 10 (1963), a case involving the Board's assertion of jurisdiction over foreign seamen, the Court declined to read the National Labor Relations Act so as to give rise to a serious question of separation of powers which in turn would have implicated sensitive issues of the authority of the Executive over relations with foreign nations. The international implications of the case led the Court to describe it as involving "public questions particularly high in the scale of our national interest." *Id.,* at 17. Because of those questions the Court held that before sanctioning the Board's exercise of jurisdiction " 'there must be present the affirmative intention of the Congress clearly expressed.' " *Id.,* at 21–22 (quoting *Benz* v. *Compania Naviera Hidalgo,* 353 U. S. 138, 147 (1957)).

The values enshrined in the First Amendment plainly rank high "in the scale of our national values." In keeping with the Court's prudential policy it is incumbent on us to determine whether the Board's exercise of its jurisdiction here would give rise to serious constitutional questions. If so, we must first identify "the affirmative intention of the Congress clearly expressed" before concluding that the Act grants jurisdiction.

## V

In recent decisions involving aid to parochial schools we have recognized the critical and unique role of the teacher in fulfilling the mission of a church-operated school. What was said of the schools in *Lemon* v. *Kurtzman,* 403 U. S. 602, 617 (1971), is true of the schools in this case: "Religious authority necessarily pervades the school system." The key role played by teachers in such a school system has been the predicate for our conclusions that governmental aid channeled through teachers creates an impermissible risk of excessive governmental entanglement in the affairs of the church-operated schools. For example, in *Lemon, supra,* at 617, we wrote:

> "In terms of potential for involving some aspect of faith or morals *in secular subjects,* a textbook's content is ascertainable, but a teacher's handling of a subject is not. We cannot ignore the danger that a teacher under religious control and discipline poses to the separation of the religious from the purely secular aspects of pre-college education. The conflict of functions inheres in the situation." (Emphasis added.)

Only recently we again noted the importance of the teacher's function in a church school: "Whether the subject is 'remedial reading,' 'advanced reading,' or simply 'reading,' a teacher remains a teacher, and the danger that religious doctrine will become intertwined with secular instruction persists." *Meek* v. *Pittenger,* 421 U. S. 349, 370 (1975). Cf.

*Wolman* v. *Walter*, 433 U. S. 229, 244 (1977). Good intentions by government—or third parties—can surely no more avoid entanglement with the religious mission of the school in the setting of mandatory collective bargaining than in the well-motivated legislative efforts consented to by the church-operated schools which we found unacceptable in *Lemon, Meek,* and *Wolman.*

The Board argues that it can avoid excessive entanglement since it will resolve only factual issues such as whether an anti-union animus motivated an employer's action. But at this stage of our consideration we are not compelled to determine whether the entanglement is excessive as we would were we considering the constitutional issue. Rather, we make a narrow inquiry whether the exercise of the Board's jurisdiction presents a significant risk that the First Amendment will be infringed.

Moreover, it is already clear that the Board's actions will go beyond resolving factual issues. The Court of Appeals' opinion refers to charges of unfair labor practices filed against religious schools. 559 F. 2d, at 1125, 1126. The court observed that in those cases the schools had responded that their challenged actions were mandated by their religious creeds. The resolution of such charges by the Board, in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.[10]

The Board's exercise of jurisdiction will have at least one other impact on church-operated schools. The Board will be called upon to decide what are "terms and conditions of

---

[10] This kind of inquiry and its sensitivity are illustrated in the examination of Monsignor O'Donnell, the Rector of Quigley North, by the Board's Hearing Officer, which is reproduced in the appendix to this opinion.

employment" and therefore mandatory subjects of bargaining. See 29 U. S. C. § 158 (d). Although the Board has not interpreted that phrase as it relates to educational institutions, similar state provisions provide insight into the effect of mandatory bargaining. The Oregon Court of Appeals noted that "nearly everything that goes on in the schools affects teachers and is therefore arguably a 'condition of employment.'" *Springfield Education Assn.* v. *Springfield School Dist. No. 19,* 24 Ore. App. 751, 759, 547 P. 2d 647, 650 (1976).

The Pennsylvania Supreme Court aptly summarized the effect of mandatory bargaining when it observed that the "introduction of a concept of mandatory collective bargaining, regardless of how narrowly the scope of negotiation is defined, necessarily represents an encroachment upon the former autonomous position of management." *Pennsylvania Labor Relations Board* v. *State College Area School Dist.,* 461 Pa. 494, 504, 337 A. 2d 262, 267 (1975). Cf. *Clark County School Dist.* v. *Local Government Employee-Management Relations Board,* 90 Nev. 442, 447, 530 P. 2d 114, 117–118 (1974). See M. Lieberman & M. Moskow, Collective Negotiations for Teachers 221–247 (1966). Inevitably the Board's inquiry will implicate sensitive issues that open the door to conflicts between clergy-administrators and the Board, or conflicts with negotiators for unions. What we said in *Lemon, supra,* at 616, applies as well here:

> "[P]arochial schools involve substantial religious activity and purpose.
>
> "The substantial religious character of these church-related schools gives rise to entangling church-state relationships of the kind the Religion Clauses sought to avoid." (Footnote omitted.)

Mr. Justice Douglas emphasized this in his concurring opinion in *Lemon,* noting "the admitted and obvious fact that the *raison d'être* of parochial schools is the propagation of a religious faith." 403 U. S., at 628.

The church-teacher relationship in a church-operated school differs from the employment relationship in a public or other nonreligious school. We see no escape from conflicts flowing from the Board's exercise of jurisdiction over teachers in church-operated schools and the consequent serious First Amendment questions that would follow. We therefore turn to an examination of the National Labor Relations Act to decide whether it must be read to confer jurisdiction that would in turn require a decision on the constitutional claims raised by respondents.

## VI

There is no clear expression of an affirmative intention of Congress that teachers in church-operated schools should be covered by the Act. Admittedly, Congress defined the Board's jurisdiction in very broad terms; we must therefore examine the legislative history of the Act to determine whether Congress contemplated that the grant of jurisdiction would include teachers in such schools.

In enacting the National Labor Relations Act in 1935, Congress sought to protect the right of American workers to bargain collectively. The concern that was repeated throughout the debates was the need to assure workers the right to organize to counterbalance the collective activities of employers which had been authorized by the National Industrial Recovery Act. But congressional attention focused on employment in private industry and on industrial recovery. See, e. g., 79 Cong. Rec. 7573 (1935) (remarks of Sen. Wagner), 2 National Labor Relations Board, Legislative History of the National Labor Relations Act, 1935, pp. 2341–2343 (1949).

Our examination of the statute and its legislative history indicates that Congress simply gave no consideration to church-operated schools. It is not without significance, however, that the Senate Committee on Education and Labor chose a college professor's dispute with the college as an example of

employer-employee relations *not* covered by the Act. S. Rep. No. 573, 74th Cong., 1st Sess., 7 (1935), 2 Legislative History, *supra,* at 2307.

Congress' next major consideration of the jurisdiction of the Board came during the passage of the Labor Management Relations Act of 1947—the Taft-Hartley Act. In that Act Congress amended the definition of "employer" in § 2 of the original Act to exclude nonprofit hospitals. 61 Stat. 137, 29 U. S. C. § 152 (2) (1970 ed.). There was some discussion of the scope of the Board's jurisdiction but the consensus was that nonprofit institutions in general did not fall within the Board's jurisdiction because they did not affect commerce. See H. R. 3020, 80th Cong., 1st Sess. (1947), 1 National Labor Relations Board, Legislative History of the Labor Management Relations Act, 1947, p. 34 (1948) (hereinafter Leg. Hist.); H. R. Rep. No. 245, 80th Cong., 1st Sess., 12 (1947), 1 Leg. Hist. 303; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 3, 32 (1947), 1 Leg. Hist. 507, 536; 93 Cong. Rec. 4997 (1947), 2 Leg. Hist. 1464 (remarks of Sens. Tydings and Taft).[11]

The most recent significant amendment to the Act was passed in 1974, removing the exemption of nonprofit hospitals. Pub. L. 93–360, 88 Stat. 395. The Board relies upon that amendment as showing that Congress approved the Board's exercise of jurisdiction over church-operated schools. A close examination of that legislative history, however, reveals nothing to indicate an affirmative intention that such schools be within the Board's jurisdiction. Since the Board did not assert jurisdiction over teachers in a church-operated

---

[11] The National Labor Relations Act was amended again when Congress passed the Labor-Management Reporting and Disclosure Act in 1959. 73 Stat. 519. That Act made no changes in the definition of "employer" and the legislative history contains no reference to church-operated schools. See generally National Labor Relations Board, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (1959).

school until after the 1974 amendment, nothing in the history of the amendment can be read as reflecting Congress' tacit approval of the Board's action.

During the debate there were expressions of concern about the effect of the bill on employees of religious hospitals whose religious beliefs would not permit them to join a union. 120 Cong. Rec. 12946, 16914 (1974), Legislative History of the Coverage of Nonprofit Hospitals under the National Labor Relations Act, 1974, 93d Cong., 2d Sess., 118, 331–332 (1974) (remarks of Sen. Ervin and Rep. Erlenborn). The result of those concerns was an amendment which reflects congressional sensitivity to First Amendment guarantees:

> "Any employee of a health care institution who is a member of and adheres to established and traditional tenets or teachings of a bona fide religion, body, or sect which has historically held conscientious objections to joining or financially supporting labor organizations shall not be required to join or financially support any labor organization as a condition of employment; except that such employee may be required, in lieu of periodic dues and initiation fees, to pay sums equal to such dues and initiation fees to a nonreligious charitable fund exempt from taxation under section 501 (c)(3) of title 26, chosen by such employee from a list of at least three such funds, designated in a contract between such institution and a labor organization, or if the contract fails to designate such funds, then to any such fund chosen by the employee." 29 U. S. C. § 169.

The absence of an "affirmative intention of the Congress clearly expressed" fortifies our conclusion that Congress did not contemplate that the Board would require church-operated schools to grant recognition to unions as bargaining agents for their teachers.

The Board relies heavily upon *Associated Press* v. *NLRB,*

301 U. S. 103 (1937). There the Court held that the First Amendment was no bar to the application of the Act to the Associated Press, an organization engaged in collecting information and news throughout the world and distributing it to its members. Perceiving nothing to suggest that application of the Act would infringe First Amendment guarantees of press freedoms, the Court sustained Board jurisdiction. *Id.*, at 131–132. Here, on the contrary, the record affords abundant evidence that the Board's exercise of jurisdiction over teachers in church-operated schools would implicate the guarantees of the Religion Clauses.

Accordingly, in the absence of a clear expression of Congress' intent to bring teachers in church-operated schools within the jurisdiction of the Board, we decline to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses.

*Affirmed.*

## APPENDIX TO OPINION OF THE COURT

Q. [by Hearing Officer] Now, we have had quite a bit of testimony already as to liturgies, and I don't want to beat a dead horse; but let me ask you one question: If you know, how many liturgies are required at Catholic parochial high schools; do you know?

A. I think our first problem with that would be defining liturgies. That word would have many definitions. Do you want to go into that?

Q. I believe you defined it before, is that correct, when you first testified?

A. I am not sure. Let me try briefly to do it again, okay?

Q. Yes.

A. A liturgy can range anywhere from the strictest sense of the word, which is the sacrifice of the Mass in the Roman

Catholic terminology. It can go from that all the way down to a very informal group in what we call shared prayer.

Two or three individuals praying together and reflecting their own reactions to a scriptural reading. All of these—and there is a big spectrum in between those two extremes—all of these are popularly referred to as liturgies.

Q. I see.

A. Now, possibly in repeating your question, you could give me an idea of that spectrum, I could respond more accurately.

Q. Well, let us stick with the formal Masses. If you know, how many Masses are required at Catholic parochial high schools?

A. Some have none, none required. Some would have two or three during the year where what we call Holy Days of Obligation coincide with school days. Some schools on those days prefer to have a Mass within the school day so the students attend there, rather than their parish churches. Some schools feel that is not a good idea; they should always be in their parish church; so that varies a great deal from school to school.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACKMUN join, dissenting.

The Court today holds that coverage of the National Labor Relations Act does not extend to lay teachers employed by church-operated schools. That construction is plainly wrong in light of the Act's language, its legislative history, and this Court's precedents. It is justified solely on the basis of a canon of statutory construction seemingly invented by the Court for the purpose of deciding this case. I dissent.

I

The general principle of construing statutes to avoid unnecessary constitutional decisions is a well-settled and salutary

one. The governing canon, however, is *not* that expressed by the Court today. The Court requires that there be a "clear expression of an affirmative intention of Congress" before it will bring within the coverage of a broadly worded regulatory statute certain persons whose coverage might raise constitutional questions. *Ante,* at 504. But those familiar with the legislative process know that explicit expressions of congressional intent in such broadly inclusive statutes are not commonplace. Thus, by strictly or loosely applying its requirement, the Court can virtually remake congressional enactments. This flouts Mr. Chief Justice Taft's admonition "that amendment may not be substituted for construction, and that a court may not exercise legislative functions to save [a] law from conflict with constitutional limitation." *Yu Cong Eng* v. *Trinidad,* 271 U. S. 500, 518 (1926). See *Aptheker* v. *Secretary of State,* 378 U. S. 500, 515 (1964); *Jay* v. *Boyd,* 351 U. S. 345, 357 n. 21 (1956); *Shapiro* v. *United States,* 335 U. S. 1, 31, and n. 40 (1948); *United States* v. *Sullivan,* 332 U. S. 689, 693 (1948); *Hopkins Savings Assn.* v. *Cleary,* 296 U. S. 315, 335 (1935).[1]

---

[1] The Court's new canon derives from the statement, " 'there must be present the affirmative intention of the Congress clearly expressed,' " in *McCulloch* v. *Sociedad Nacional de Marineros de Honduras,* 372 U. S. 10, 21–22 (1963). Reliance upon that case here is clearly misplaced. The question in *McCulloch* was whether the National Labor Relations Act extended to foreign seamen working aboard foreign-flag vessels. No question as to the constitutional power of Congress to cover foreign crews was presented. Indeed, all parties agreed that Congress was constitutionally empowered to reach the foreign seamen involved while they were in American waters. *Id.,* at 17. The only question was whether Congress had intended to do so.

The *McCulloch* Court held that Congress had not meant to reach disputes between foreign shipowners and their foreign crews. *McCulloch,* however, did not turn simply upon an absence of affirmative evidence that Congress wanted to reach alien seamen, but rather upon the fact, as a prior case had already held, that the legislative history " 'inescapably describe[d] the boundaries of the Act as including only the workingmen of

The settled canon for construing statutes wherein constitutional questions may lurk was stated in *Machinists* v. *Street,* 367 U. S. 740 (1961), cited by the Court, *ante,* at 500:

> " 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is *fairly possible* by which the question may be avoided.' *Crowell* v. *Benson,* 285 U. S. 22, 62." *Id.,* at 749–750 (emphasis added).[2]

Accord, *Pernell* v. *Southall Realty,* 416 U. S. 363, 365 (1974); *Johnson* v. *Robison,* 415 U. S. 361, 367 (1974); *Curtis* v. *Loether,* 415 U. S. 189, 192 n. 6 (1974); *Ashwander* v. *TVA,* 297 U. S. 288, 348 (1936) (Brandeis, J., concurring); *Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379 (1933). This limitation to constructions that are "fairly possible," and "reasonable," see *Yu Cong Eng* v. *Trinidad, supra,* at 518, acts as a

---

our own country and its possessions,' " *Id.,* at 18, quoting *Benz* v. *Compania Naviera Hidalgo,* 353 U. S. 138, 144 (1957). The Court also noted that under well-established rules of international law, "the law of the flag state ordinarily governs the internal affairs of a ship. See *Wildenhus's Case,* [120 U. S. 1,] 12." 372 U. S., at 21. In light of that contrary legislative history and domestic and international precedent, it is not at all surprising that *McCulloch* balked at holding foreign seamen covered without a strong affirmative showing of congressional intent. As the Court today admits, there is no such contrary legislative history or precedent with respect to jurisdiction over church-operated schools. *Ante,* at 504. The *McCulloch* statement, therefore, has no role to play in this case.

[2] In *Street,* the Court construed the Railway Labor Act as not permitting the use of an employee's compulsorily checked-off union dues for political causes with which he disagreed. As in *McCulloch,* see n. 1, *supra,* it so held not because of an absence of affirmative evidence that Congress *did* mean to permit such uses, but rather because the language and history of the Act indicated affirmatively that Congress *did not* mean to permit such constitutionally questionable practices. See 367 U. S., at 765–770.

brake against wholesale judicial dismemberment of congressional enactments. It confines the judiciary to its proper role in construing statutes, which is to interpret them so as to give effect to congressional intention. The Court's new "affirmative expression" rule releases that brake.

## II

The interpretation of the National Labor Relations Act announced by the Court today is not "fairly possible." The Act's wording, its legislative history, and the Court's own precedents leave "the intention of the Congress . . . revealed too distinctly to permit us to ignore it because of mere misgivings as to power." *Moore Ice Cream Co.* v. *Rose, supra,* at 379. Section 2 (2) of the Act, 29 U. S. C. § 152 (2), defines "employer" as

> ". . . any person acting as an agent of an employer, directly or indirectly, *but shall not include* the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization." (Emphasis added.)

Thus, the Act covers all employers not within the eight express exceptions. The Court today substitutes amendment for construction to insert one more exception—for church-operated schools. This is a particularly transparent violation of the judicial role: The legislative history reveals that Congress itself considered and rejected a very similar amendment.

The pertinent legislative history of the NLRA begins with the Wagner Act of 1935, 49 Stat. 449. Section 2 (2) of that Act, identical in all relevant respects to the current section, excluded from its coverage neither church-operated schools

nor any other private nonprofit organization.[3]  Accordingly, in applying that Act, the National Labor Relations Board did not recognize an exception for nonprofit employers, even when religiously associated.[4]  An argument for an implied nonprofit exemption was rejected because the design of the Act was as clear then as it is now: "[N]either charitable institutions nor their employees are exempted from operation of the Act by its terms, although certain other employers and employees are exempted." *Central Dispensary & Emergency Hospital,* 44 N. L. R. B. 533, 540 (1942) (footnotes omitted), enf'd, 79 U. S. App. D. C. 274, 145 F. 2d 852 (1944).  Both the lower courts and this Court concurred in the Board's construction.  See *Polish National Alliance* v. *NLRB,* 322 U. S. 643 (1944), aff'g 136 F. 2d 175 (CA7 1943); *Associated Press* v. *NLRB,* 301 U. S. 103 (1937), aff'g 85 F. 2d 56 (CA2 1936); *NLRB* v. *Central Dispensary & Emergency Hospital,* 79 U. S. App. D. C. 274, 145 F. 2d 852 (1944).

The Hartley bill, which passed the House of Representa-

---

[3] Section 2 (2), 49 Stat. 450, stated:

"The term 'employer' includes any person acting in the interest of an employer, directly or indirectly, but shall not include the United States, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization."

[4] See *Christian Board of Publication,* 13 N. L. R. B. 534, 537 (1939), enf'd, 113 F. 2d 678 (CA8 1940); *American Medical Assn.,* 39 N. L. R. B. 385, 386 (1942); *Central Dispensary & Emergency Hospital,* 44 N. L. R. B. 533, 539 (1942), enf'd, 79 U. S. App. D. C. 274, 145 F. 2d 852 (1944); *Henry Ford Trade School,* 58 N. L. R. B. 1535, 1536 (1944); *Polish National Alliance,* 42 N. L. R. B. 1375, 1380 (1942), enf'd, 136 F. 2d 175 (CA7 1943), aff'd, 322 U. S. 643 (1944); *Associated Press,* 1 N. L. R. B. 788, 790, enf'd, 85 F. 2d 56 (CA2 1936), aff'd, 301 U. S. 103 (1937).  In unpublished decisions, the Board also exercised jurisdiction over the YWCA and the Welfare & Recreational Association.  See *Central Dispensary & Emergency Hospital,* 44 N. L. R. B., at 538 n. 8.

tives in 1947, would have provided the exception the Court today writes into the statute:

"The term 'employer' . . . shall not include . . . any corporation, community chest, fund, or foundation organized and operated exclusively for *religious*, charitable, scientific, literary, or *educational* purposes, . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual . . . ." (Emphasis added.) H. R. 3020, 80th Cong., 1st Sess., § 2 (2) (Apr. 18, 1947), reprinted in National Labor Relations Board, Legislative History of the Labor Management Relations Act, 1947, pp. 160–161 (hereinafter, 1947 Leg. Hist.).

But the proposed exception was not enacted.[5] The bill reported by the Senate Committee on Labor and Public Welfare did not contain the Hartley exception. See S. 1126, 80th Cong., 1st Sess., § 2'(2) (Apr. 17, 1947), 1947 Leg. Hist. 99, 102. Instead, the Senate proposed an exception limited to nonprofit hospitals, and passed the bill in that form. See H. R. 3020, 80th Cong., 1st Sess., § 2 (2) (Senate, May 13, 1947), 1947 Leg. Hist. 226, 229. The Senate version was accepted by the House in conference, thus limiting the exception

---

[5] A number of reasons were offered for the rejection of the Hartley bill's exception. Some Congressmen strongly opposed the exception, see 93 Cong. Rec. 3446 (1947) (remarks of Rep. Klein); some were opposed to additional exceptions to the Board's jurisdiction, see *id.*, at 4997 (remarks of Sen. Taft); and some thought it unnecessary, see H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 32 (1947), 1947 Leg. Hist. 536. See generally *NLRB* v. *Wentworth Institute*, 515 F. 2d 550, 555 (CA1 1975) ("[P]erhaps the most obvious, interpretation of the rejection of the House exclusion would be that Congress meant to include nonprofit organizations [within the scope of the Act]"); Sherman & Black, The Labor Board and the Private Nonprofit Employer: A Critical Examination of the Board's Worthy Cause Exemption, 83 Harv. L. Rev. 1323, 1331–1337 (1970). But whatever the reasons, it is clear that an amendment similar to that made by the Court today was proposed and rejected in 1947.

for nonprofit employers to nonprofit hospitals.  Ch. 120, 61
Stat. 136.[6]

Even that limited exemption was ultimately repealed in
1974.  Pub. L. 93–360, 88 Stat. 395.  In doing so, Congress
confirmed the view of the Act expressed here: that it was
intended to cover all employers—including nonprofit employ-
ers—unless expressly excluded, and that the 1947 amendment
excluded only nonprofit hospitals.  See H. R. Rep. No. 93–

---

[6] The Board's contemporaneous construction of the 1947 amendment
was that only nonprofit hospitals were intended to be exempt.  In 1950,
for example, in asserting jurisdiction over a nonprofit religious organiza-
tion, the Board stated:

"The Employer asserts that, as it is a nonprofit organization which is
engaged in purely religious activities, it is not engaged in commerce within
the meaning of the Act.  We find no merit in this contention. . . .  As
this Board and the courts have held, it is immaterial that the Employer
may be a nonprofit organization, or that its activities may be motivated
by considerations other than those applicable to enterprises which are, in
the generally accepted sense, commercial."  *Sunday School Board of the
Southern Baptist Convention,* 92 N. L. R. B. 801, 802.

It is true that in *Trustees of Columbia University,* 97 N. L. R. B. 424 (1951),
the Board indicated that it would not exercise jurisdiction over nonprofit,
educational institutions; but it expressly did so as a matter of discretion,
affirming that the activities of the University did come within the Act and
the Board's jurisdiction.  *Id.,* at 425.  That 1951 discretionary decision
does not undermine the validity of the Board's determination in *Cornell Uni-
versity,* 183 N. L. R. B. 329 (1970), that changing conditions—particularly
the increasing impact of such institutions on interstate commerce—now
required a change in policy leading to the renewed exercise of Board
jurisdiction.  As we emphasized in *NLRB* v. *Weingarten, Inc.,* 420 U. S.
251, 265–266 (1975):

"To hold that the Board's earlier decisions froze the development of this
important aspect of the national labor law would misconceive the nature of
administrative decisionmaking.  ' "Cumulative experience" begets under-
standing and insight by which judgments . . . are validated or qualified
or invalidated.  The constant process of trial and error, on a wider and
fuller scale than a single adversary litigation permits, differentiates per-
haps more than anything else the administrative from the judicial process.'
*NLRB* v. *Seven-Up Co.,* 344 U. S. 344, 349 (1953)."

1051, p. 4 (1974), reprinted in Senate Committee on Labor and Public Welfare, Legislative History of the Coverage of Nonprofit Hospitals under the National Labor Relations Act, 1974, p. 272 (Comm. Print 1974) (hereafter 1974 Leg. Hist.); 120 Cong. Rec. 12938 (1974), 1974 Leg. Hist. 95 (Sen. Williams); 120 Cong. Rec. 16900 (1974), 1974 Leg. Hist. 291 (Rep. Ashbrook).[7] Moreover, it is significant that in considering the 1974 amendments, the Senate expressly rejected an amendment proposed by Senator Ervin that was analogous to the one the Court today creates—an amendment to exempt nonprofit hospitals operated by religious groups. 120 Cong. Rec. 12950, 12968 (1974), 1974 Leg. Hist. 119, 141. Senator Cranston, floor manager of the Senate Committee bill and primary opponent of the proposed religious exception, explained:

> "[S]uch an exception for religiously affiliated hospitals would seriously erode *the existing national policy which holds religiously affiliated institutions generally such as* proprietary nursing homes, residential communities, and *educational facilities to the same standards as their nonsectarian counterparts.*" 120 Cong. Rec. 12957 (1974), 1974 Leg. Hist. 137 (emphasis added).

---

[7] The House Report stated: "Currently, the only broad area of charitable, eleemosynary, educational institutions wherein the Board does not now exercise jurisdiction concerns the nonprofit hospitals, explicitly excluded by section 2 (2) of the Act. . . . [T]he bill removes the existing Taft-Hartley exemption in section 2 (2) of the Act. It restores to the employees of nonprofit hospitals the same rights and protections enjoyed by the employees of proprietary hospitals and most all other employees." H. R. Rep. No. 93–1051, p. 4 (1974), 1974 Leg. Hist. 272. Similarly, Senator Williams, Chairman of the Senate Committee on Labor and Public Welfare, criticized the nonprofit-hospital exemption as "not only inconsistent with the protection enjoyed by proprietary hospitals and other types of health care institutions, but it is also inconsistent with the coverage of other nonprofit activities." 120 Cong. Rec. 12938 (1974), 1974 Leg. Hist. 95. See also 120 Cong. Rec. 16900 (1974), 1974 Leg. Hist. 291 (Rep. Ashbrook).

See also *ibid.* (Sen. Javits); 120 Cong. Rec. 12957 (1974), 1974 Leg. Hist. 138 (Sen. Williams).[8]

In construing the Board's jurisdiction to exclude church-operated schools, therefore, the Court today is faithful to neither the statute's language nor its history. Moreover, it is also untrue to its own precedents. "This Court has consistently declared that in passing the National Labor Relations Act, Congress intended to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause. See, *e. g., Guss* v. *Utah Labor Board,* 353 U. S. 1, 3; *Polish Alliance* v. *Labor Board,* 322 U. S. 643, 647–648; *Labor Board* v. *Fainblatt,* 306 U. S. 601, 607." *NLRB* v. *Reliance Fuel Oil Corp.,* 371 U. S. 224, 226 (1963) (emphasis in original). As long as an employer is within the reach of Congress' power under the Commerce Clause—and no one doubts that respondents are—the Court has held him to be covered by the Act regardless of the nature of his activity. See, *e. g., Polish National Alliance* v. *NLRB,* 322 U. S. 643 (1944) (nonprofit fraternal organization). Indeed, *Associated Press* v. *NLRB,* 301 U. S. 103 (1937), construed the Act to

---

[8] The Court relies upon the fact that the 1974 amendments provided that "[a]ny *employee* of a health care institution who is a member of . . . a bona fide religion . . . which has historically held conscientious objections to joining . . . labor organizations shall not be required to join . . . any labor organization as a condition of employment . . . ." 29 U. S. C. § 169 (emphasis added). This is, of course, irrelevant to the instant case, as no employee has alleged that he was required to join a union against his religious principles and not even the respondent employers contend that collective bargaining itself is contrary to their religious beliefs. Recognizing this, the Court has limited its inference from the amendment to the proposition that it reflects "congressional sensitivity to First Amendment guarantees." *Ante,* at 506. This is quite true, but its usefulness as support for the Court's opinion is completely negated by the rejection of the Ervin amendment, see text, *supra,* which makes clear the balance struck by Congress. While Congress agreed to exclude conscientiously objecting employees, it expressly refused to sanction an exclusion for all religiously affiliated employers.

cover editorial employees of a nonprofit news-gathering organization despite a claim—precisely parallel to that made here—that their inclusion rendered the Act in violation of the First Amendment.[9] Today's opinion is simply unable to explain the grounds that distinguish that case from this one.[10]

Thus, the available authority indicates that Congress intended to include—not exclude—lay teachers of church-operated schools. The Court does not counter this with evidence that Congress *did* intend an exception it never stated. Instead, despite the legislative history to the contrary, it construes the Act as excluding lay teachers only because Congress did not state explicitly that they were covered. In Mr. Justice Cardozo's words, this presses "avoidance of a

---

[9] *Associated Press* stated the employer's argument as follows:

"The conclusion which the petitioner draws is that whatever may be the case with respect to employees in its mechanical departments it must have absolute and unrestricted freedom to employ and to discharge those who, like Watson, edit the news, that there must not be the slightest opportunity for any bias or prejudice personally entertained by an editorial employee to color or to distort what he writes, and that the Associated Press cannot be free to furnish unbiased and impartial news reports unless it is equally free to determine for itself the partiality or bias of editorial employees. So it is said that any regulation protective of union activities, or the right collectively to bargain on the part of such employees, is necessarily an invalid invasion of the freedom of the press." 301 U. S., at 131.

[10] The Court would distinguish *Associated Press* on the ground that there the Court "[p]erceiv[ed] nothing to suggest that application of the Act would infringe First Amendment guarantees . . . [while h]ere, on the contrary, the record affords abundant evidence that the Board's exercise of jurisdiction . . . would implicate the guarantees of the Religion Clauses." *Ante,* at 507. But this is mere assertion. The Court does not explain *why* the press' First Amendment problem in *Associated Press* was any less substantial than the church-supported schools' First Amendment challenge here. In point of fact, the problems raised are of precisely the same difficulty. The Court therefore cannot square its judicial "reconstruction" of the Act in this case with the refusal to rewrite the same Act in *Associated Press.*

.

difficulty . . . to the point of disingenuous evasion." *Moore Ice Cream Co.* v. *Rose,* 289 U. S., at 379.[11]

## III

Under my view that the NLRA includes within its coverage lay teachers employed by church-operated schools, the constitutional questions presented would have to be reached. I do not now do so only because the Court does not. See *Sierra Club* v. *Morton,* 405 U. S. 727, 755 (1972) (BRENNAN, J., dissenting). I repeat for emphasis, however, that while the resolution of the constitutional question is not without difficulty, it is irresponsible to avoid it by a cavalier exercise in statutory interpretation which succeeds only in defying congressional intent. A statute is not "a nose of wax to be changed from that which the plain language imports . . . ." *Yu Cong Eng* v. *Trinidad,* 271 U. S., at 518.

---

[11] Not even the Court's redrafting of the statute causes all First Amendment problems to disappear. The Court's opinion implies limitation of its exception to church-operated schools. That limitation is doubtless necessary since this Court has already rejected a more general exception for nonprofit organizations. See *Polish National Alliance* v. *NLRB,* 322 U. S. 643 (1944). But such an exemption, available only to church-operated schools, generates a possible Establishment Clause *question* of its own. *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970), does not put that question to rest, for in upholding the property tax exemption for churches there at issue, we emphasized that New York had "not singled out . . . churches as such; rather, it has granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations . . . ." *Id.,* at 673. Like the Court, "at this stage of [my] consideration [I am] not compelled to determine whether the [Establishment Clause problem] is [as significant] as [I] would were [I] considering the constitutional issue." *Ante,* at 502. It is enough to observe that no matter which way the Court turns in interpreting the Act, it cannot avoid constitutional questions.