No. 84–336. BUSHEY ET AL. *v.* NEW YORK STATE CIVIL SERVICE COMMISSION ET AL. C. A. 2d Cir. Certiorari denied.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE WHITE join, dissenting.

In *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), this Court held that a private employer does not violate Title VII of the 1964 Civil Rights Act when it voluntarily undertakes "affirmative action," as long as that action is taken "to eliminate conspicuous racial imbalance in traditionally segregated job categories." *Id.*, at 209. But the *Weber* Court began its analysis by stating:

> "We emphasize at the outset the narrowness of our inquiry. Since the Kaiser-USWA plan does not involve state action, this case does not present an alleged violation of the Equal Protection Clause of the Fourteenth Amendment." *Id.*, at 200.

I believe that this case squarely presents the question left open in *Weber*.

The controversy here centers on a written examination required of all applicants seeking the position of "Correction Captain" in the New York State prison correctional system. The exam results are combined with credit for seniority and Armed Forces service to arrive at a ranking list, which list is used to fill positions as they become open. The specific test in issue was administered to 275 candidates on January 30, 1982. Thirty-two of these were minority candidates, and 243 were nonminority. The test was an

objective test consisting of 103 questions. Of the minority candidates, eight, or 25%, passed the examination by scoring 70% or higher. Forty-eight percent of the nonminorities passed.

The State reviewed these results in light of a rule of the Equal Employment Opportunity Commission, which states that evidence that an employer selects minority candidates for employment positions at a rate that is less than 80% of the selection rate for nonminorities "will generally be regarded . . . as evidence of adverse impact," see 29 CFR § 1607.4(D) (1984). It concluded that the test's minority selection rate of approximately 50% demonstrated an adverse impact on minority candidates. Given this statistical disparity, the fact that the State had been sued by minorities with respect to two prior examinations for correctional officer positions,[1] and the lack of any indication that minorities would not perform equally well in the position of Correction Captain, the State unilaterally decided to raise the scores of minority candidates by establishing a separate normalization curve for minority candidates and equating the mean of that curve with the mean for nonminorities. The upshot of this action was that eight more minority candidates passed the test; although no nonminority candidates were taken off the list the scores of all minority candidates were increased, and the highest scoring minority candidate became the highest scoring of all the candidates.

Petitioners are several nonminority candidates who claim they were injured by the State's action because they were "bumped" down the ranking list by minority candidates whose scores were increased. They brought suit claiming that the State's unilateral adoption of race-conscious employment policies violated Title VII and the Fourteenth Amendment. The District Court agreed that the State's action violated Title VII[2] for three reasons: first, it did not believe that the evidence supplied by the State established a prima facie case of discrimination; second, it did not believe in

---

[1] See *Kirkland* v. *New York State Dept. of Correctional Services*, 711 F. 2d 1117 (CA2 1983), cert. denied, 465 U. S. 1005 (1984); *Kirkland* v. *New York State Dept. of Correctional Services*, 520 F. 2d 420 (CA2 1975), cert. denied, 429 U. S. 823 (1976), on remand, 628 F. 2d 796 (CA2 1980), cert. denied, 450 U. S. 980 (1981).

[2] The court dismissed petitioners' claim under 42 U. S. C. § 1983, and that decision was not appealed.

any event that the State could take race-conscious action when it had not attempted or considered rebutting a prima facie case with proof that the employment decisions were based on legitimate job-related criteria—in this case a professionally developed job-related examination; and third, it thought the remedy adopted by the State was "fundamentally flawed." 571 F. Supp. 1562 (1983).

The Court of Appeals for the Second Circuit reversed. 733 F. 2d 220 (1984). It held that the State had properly determined that a prima facie case was made out by reference to the EEOC guidelines. It then reasoned that the State was not required to rebut this case before taking the affirmative race-conscious steps taken here. The court suggested that the District Court's analysis was contrary to Title VII's policy favoring voluntary compliance because it only permitted the State to take race-conscious actions after there had been a judicial determination that the Act had been violated. Such a rule would actually promote litigation, and would only result in the State's waiting to be sued and then settling. The court relied on its prior opinion in *Kirkland* v. *New York State Dept. of Correctional Services*, 711 F. 2d 1117 (1983), cert. denied, 465 U. S. 1005 (1984), in which it had approved a settlement with respect to the results of the written examination for Correction Lieutenant. The court also relied on *Weber*, *supra*, noting that in *Weber* this Court had approved voluntary affirmative action even in the absence of a determination that the employer had discriminated. In a footnote, the opinion refused to distinguish *Weber* on the ground that this case involved a public employer. 733 F. 2d, at 227, n. 8. Finally, the court rejected the District Court's characterization of the "remedy" as "fundamentally flawed," noting that the score adjustment did not displace nonminority candidates from the list or bar their advancement. It nevertheless remanded the case for determination of whether the remedy "unnecessarily trammel[ed] the interests" of nonminority employees, as that standard was set in *Weber*.

I believe that the Court of Appeals' opinion reaches questionable conclusions on difficult and important questions, and that certiorari should therefore be granted. Principal among these decisions is the court's unexplained extension of *Weber* to allow voluntary affirmative action by state employers. This Court has never taken the position that, consistent with the restraints of the Fourteenth Amendment, a state agency may establish preferential

classifications on the basis of race in the absence of rulings by an appropriate body that constitutional or statutory violations have occurred. See *University of California Regents* v. *Bakke*, 438 U. S. 265, 302–310 (1978) (opinion of POWELL, J.). Cf. *Firefighters* v. *Stotts*, 467 U. S. 561, 583 (1984) (again reserving the question of a public employer's ability to adopt voluntary affirmative-action plans).[3] Certainly the express reservation of the question in *Weber* suggests that a public employer may fare differently in this regard from a private employer, and no decision of this Court subsequent to *Weber* holds that it is consistent with the Fourteenth Amendment for a state agency unilaterally to decide to use race-based criteria to favor minorities in employment decisions. The States are not granted the enforcement power under § 5 of the Fourteenth Amendment that many Members of this Court found important in upholding the congressional Act in *Fullilove* v. *Klutznick*, 448 U. S. 448, 472 (1980) (opinion of BURGER, C. J.); *id.*, at 500 (POWELL, J., concurring). Nor is there even a hint in the opinions below that the State Correction Department has violated the Fourteenth Amendment, either in utilizing this particular test or otherwise, by purposefully discriminating against minority employees. The test itself has been deemed irrelevant to this litigation. All that has happened here is that the State has perceived a statistical disparity in the test results of minority and nonminority applicants, and, at least in part because it fears a lawsuit by minority applicants, it has chosen to do away with that disparity by discriminating against similarly situated nonminority applicants.

I find unpersuasive the Court of Appeals' argument that requiring a judicial determination of discrimination in these cases will undermine Title VII's policy favoring voluntary compliance. Although voluntary compliance is a laudable goal, Members of this Court have recognized on other occasions that "affirmative action" plans must be policed to prevent the practice of discrimination for discrimination's sake, see *Bakke, supra*, at 307–310 (opinion of POWELL, J.); cf. *Fullilove, supra*, at 480 (opinion of BURGER, C. J.); and to protect the interests of innocent third parties, see

---

[3] That this question is both important and unsettled is reflected in the several diverse opinions of the judges of the Court of Appeals for the Fifth Circuit, sitting en banc in *Williams* v. *City of New Orleans*, 729 F. 2d 1554 (1984).

*Weber*, 443 U. S., at 208–209. These interests will not be sufficiently protected if agencies charged with discrimination may simply cave in to the allegations without even considering justifications for, or attempting to justify, their original employment decisions, particularly where the allegations are based only upon disparate impact. I therefore disagree with the Court of Appeals' suggestion that it would in any event be sufficient for the State to wait until it is sued and then settle; in these situations the state employer is in a difficult position; it has a duty to act nondiscriminatorily toward both minority and nonminority applicants and its employment decisions must be justified to both sides. States should not be allowed to practice racial discrimination anew under the guise of atoning for past discrimination or because of the difficulties with mounting an otherwise legitimate defense to a lawsuit.

Thus, even if it were clear that state agencies may engage in this sort of "affirmative action" in the absence of a finding of discrimination, review here is still warranted to address the circumstances under which this type of "affirmative action" would be permissible.

Petitioners did not press their Fourteenth Amendment claim on appeal, and it may be that the Court sees this fact as an adequate basis for denying certiorari. But I do not think that review of these issues is thereby foreclosed. Petitioners may be precluded from arguing directly that the state action here violated the Fourteenth Amendment, but I think that when a state employer claims that arguably discriminatory conduct on its part is nonetheless authorized by Title VII, the claim of such statutory authorization must be considered in the light of the prohibitions of the Fourteenth Amendment. I doubt that when Congress amended Title VII in 1972 to bring state agencies within its mandate it intended to allow those agencies to claim that their actions were shielded under Title VII even if the actions would violate the Fourteenth Amendment. The issue is one of statutory construction, but as always the statute must be read with the presumption that Congress did not intend to authorize conduct that is prohibited by the Constitution. See *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 500–501 (1979).

I think this Court should grant certiorari in this case to decide the question left open in *Weber*, and to address the other difficult questions presented by the decision of the Court of Appeals.