**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LEWIS UNIVERSITY, Respondent.**

**No. 83–2873.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1984.

Decided June 17, 1985.

Swygert, Senior Circuit Judge, filed a dissenting opinion.

David Fleischer, Elliott Moore, N.L.R.B., Washington, D.C., for petitioner.

Carol Berlin Manzoni, Pope Ballard Shepard & Fowle, Ltd., Chicago, Ill., for respondent.

Before ESCHBACH and COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.

COFFEY, Circuit Judge.

The National Labor Relations Board petitions this court to enforce an order requiring the respondent, Lewis University, to cease and desist its practice of refusing to bargain with the College of Arts and Sciences full-time faculty. We deny enforcement of the order.[1]

---

**1.** Lewis University characterizes itself as a cross-petitioner in this action but a review of

the record reveals that Lewis University never filed a cross-petition to vacate the National La-

## I

The record reveals that the respondent, Lewis University, is an institution of higher education affiliated with the Catholic Church.[2] The University, located on a small, rural campus in Romeoville, Illinois, consists of three colleges—Arts and Sciences, Nursing, and Business—with a total enrollment of approximately 3,200 students. On April 1, 1975, the National Labor Relations Board ("NLRB" or "Board") certified the University's Faculty Life Committee as the exclusive bargaining representative for a unit consisting of:

> "all full-time faculty within the College of Arts and Sciences including professors, associate professors, assistant professors, and instructors, and excluding all professional librarians, part-time faculty, all faculty of the College of Nursing and Continuing Education, all deans, guidance counselors, office clerical employees, guards, supervisors as defined in the Act, and all other employees."

*Lewis University,* 265 N.L.R.B. 1239, 1242 n. 15 (1982). In September 1975, the Faculty Life Committee executed a three-year collective bargaining agreement with the Board of Trustees, on behalf of the College of Arts and Sciences full-time faculty. The agreement expired August 31, 1978, but was extended, by consent of the parties, as negotiations for a new agreement continued.

On February 20, 1980, the Supreme Court issued its decision in *NLRB v. Yeshiva University,* 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) (*"Yeshiva"*), ruling that members of the Yeshiva faculty were managerial personnel and thus excluded from the National Labor Relations Act, 29 U.S.C. § 151 *et seq* (1982).[3] Following the Supreme Court's *Yeshiva* decision, Lewis University and the Faculty Life Committee each filed a unit clarification petition with the NLRB on the issue of whether the full-time faculty members of the College of Arts and Sciences constitute managerial personnel. Additionally, the University filed motions with the Board to revoke the Faculty Life Committee's certification as the exclusive bargaining representative because (1) pursuant to the Supreme Court's holding in *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (*"Catholic Bishop"*), the NLRB lacks statutory jurisdiction over teachers in church-operated schools, such as Lewis University;[4] and (2) under the Supreme Court's reasoning in *Yeshiva,* the full-time faculty of the College of Arts and

bor Relations Board's cease and desist order. Accordingly, our disposition of this case is simply to deny enforcement of the order.

**2.** According to the evidence presented to the National Labor Relations Board, Lewis University was established in 1930 by the Catholic Archdiocese of Chicago to "provide education in the Catholic tradition and character." In 1959, the Chicago Archdiocese deeded its ownership interest in the real and personal property of the University to the newly formed Catholic Diocese of Joliet. In 1960, the Bishop of Joliet transferred control and administration of the University to the Brothers of the Christian Schools, a Catholic religious teaching order. In 1974, the religious order conveyed its interest to a private Board of Trustees, provided that the University remain Catholic. In return, the University agreed to compensate members of the religious order for their teaching services and to lease portions of the land to the order in perpetuity. *See Lewis University,* 265 N.L.R.B. 1239 (1982).

**3.** In *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), the Supreme Court reasoned that Congress regards manage-

rial personnel "as so clearly outside the [National Labor Relations] Act that no specific exclusionary provision was thought necessary." *Id.* at 283, 94 S.Ct. at 1766. Thus, according to the Court, there is a "judicially implied exclusion for 'managerial employees' who are involved in developing and enforcing employer policy." *Yeshiva,* 444 U.S. at 682, 100 S.Ct. at 862.

**4.** In *Catholic Bishop,* the Supreme Court reviewed the legislative history of the National Labor Relations Act and concluded that there is no "clear expression of Congress' intent to bring teachers in church-operated schools within the jurisdiction of the Board." 440 U.S. at 507, 99 S.Ct. at 1322. The Court added that "the Board's exercise of jurisdiction over teachers in church-operated schools would implicate the guarantees of the Religion Clauses." *Id.* Thus, the Court held that the NLRB lacked jurisdiction over teachers in church-operated secondary schools within the Catholic Archdiocese of Chicago, Illinois and the Catholic Diocese of South Bend-Fort Wayne, Indiana.

Sciences are managerial personnel, excluded from the National Labor Relations Act.

On December 16, 1982, the Board, in a three to two decision, denied the University's motions to revoke the Faculty Life Committee's certification and also dismissed each party's petition for unit clarification. The entire Board agreed that it had jurisdiction in this matter because:

"First we do not believe that *Catholic Bishop* prevents the Board from asserting jurisdiction because, as we have stated before, *Catholic Bishop* applies only to parochial elementary and secondary schools, not to institutions of higher learning such as Lewis University. *College of Notre Dame*, 245 NLRB 386 (1979), and *Barber-Scotia College, Inc.*, 245 NLRB 406 (1979). Furthermore, ... we conclude that Lewis University is not church-operated as contemplated by *Catholic Bishop*, and that the Board clearly has statutory jurisdiction over the Employer."

*Lewis University*, 265 N.L.R.B. at 1239.[5] A majority of the Board further ruled that:

"after considering this case in light of the Supreme Court's decision in *Yeshiva*, we find that the faculty members, either as individuals or in their capacity as members of various committees, exercise independent judgment in the routine discharge of their professional duties, but do not effectively formulate and effectuate the policies of the Employer. Therefore, we find they are not excluded from coverage under the [National Labor Relations] Act as managerial employees." *Id.* at 1241 (footnote omitted). To support this finding, the majority relied chiefly upon a management rights clause in the expired collective bargaining agreement between the University and the College of Arts and Sciences full-time faculty providing, in pertinent part, that "management retains and reserves unto itself all power, right, authority, duty, and responsibility to and for the management and operation of the institution." *Id.* at 1242 n. 16.[6] According to the Board majority:

"In light of the reservation of rights in the master contract ... and the limited authority bestowed on the faculty members through the master contract ..., the master contract demonstrates that the faculty members of the College of

5. Board chairman Van de Water wrote separately on the jurisdictional issue, stating that, "I simply find that the teaching of religious courses is incidental to the operation of [Lewis] University and there is little likelihood that first amendment rights will become entangled with union representation of the faculty." *Lewis University*, 265 N.L.R.B. at 1250 n. 29 (Van de Water, dissenting).

6. The management rights clause reads in full:
"Except where expressly abridged, limited or modified by this agreement management retains and reserves unto itself all power, right, authority, duty, and responsibility to and for the management and operation of the institution. Such power and responsibility includes but is not limited to:
1) the planning, direction and control by management of all the university's operations, property, physical facilities, and equipment;
2) the acquisition, location and relocation by management of all the university's operations, property, physical facilities, and equipment;
3) the planning, development, introduction and modification of educational services and programs including new or improved methods, techniques, and programs of instruction;

4) the recruitment, hiring, classification, assignment, scheduling, transfer, promotion, discipline, and discharge of faculty members and other employees, including the right to
a) determine the qualifications of employees
b) evaluate the performance of employees
c) determine the number of employees
d) determine the working schedules of employees
e) reassign to non-bargaining unit personnel administrative functions and duties which are now, or may be in the future, assigned to bargaining unit members
f) establish and maintain rules and regulations concerning and governing employee performance, expectations and conduct;
5) the determination and scheduling of the academic calendar and other schedules of operation.
The limitations and modifications upon management rights established by this agreement shall be recognized only to the extent that such limitations and modifications are in accordance with the bylaws of Lewis University and any applicable laws."

Arts and Sciences at Lewis University were not intended to perform managerial functions or to be considered managerial employees."

*Id.* at 1242. In dissent, Board chairman Van de Water stated that:

"In my opinion, the faculty members at Lewis University are, in fact, managerial employees.... [W]hen the faculty comes together as a whole to sit as the faculty convened, it possesses and exercises managerial authority similar to that of the *Yeshiva* faculty. The faculty convened determines student admission requirements, what programs shall be offered, and what degree will be awarded to whom. It decides grading standards and graduation requirements. The faculty convened determines, in conjunction with their department chairpersons, what courses shall be offered, to whom, and at what time. The record reveals that the faculty convened, through the various standing committees, and with their department chairpersons, has extensive authority to formulate and effectuate academic policies for the University."

*Id.* at 1252 (Van de Water, dissenting). In a separate, yet equally strong dissent, Board member Hunter concluded that:

"once the majority's analysis is examined in light of the approach mandated by the Supreme Court in *Yeshiva*, no basis whatsoever remains for finding that the authority exercised by the faculty here does not constitute them as managerial personnel. Accordingly, I would revoke the Union's certification, and I join the Chairman in dissenting."

*Id.* at 1254 (Hunter, dissenting).

Following the Board's majority decision that the College of Arts and Sciences full-time faculty were an appropriate bargaining unit, the University refused to resume collective bargaining negotiations with the Faculty Life Committee. As a result, the Committee filed an unfair labor charge with the Regional Director of the NLRB, who, in turn, issued a complaint alleging that the University was engaging in unfair labor practices affecting interstate commerce within the meaning of sections 8(a)(1), (5) and 2(6), (7) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (5) and 152(6), (7).[7] The NLRB's complaint alleged, *inter alia,* that:

"Respondent's purpose in refusing to bargain collectively with the Union ... is to test and obtain Court review of the Board's certification of the Union as the exclusive collective bargaining representative of the employees in the Unit and of the Board's Decision and Order dated December 16, 1982."

On August 24, 1983, a three member panel of the Board granted the NLRB's motion for summary judgment against the University, by a vote of two to one. According to the panel majority, the University was simply repeating the same arguments of statutory jurisdiction under *Catholic Bishop* and the full-time faculty members' managerial status under *Yeshiva* that were litigated and decided in the prior unit clarification proceeding before the Board.

---

7. Title 29 U.S.C. § 158 (1982) provides, in relevant part, that:

"(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \* \*

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

Title 29 U.S.C. § 152 (1982) provides, in pertinent part, that:

"(6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

(7) The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

Thus, the majority ruled that because "[a]ll issues raised by [the University] in this proceeding were or could have been litigated in the prior unit clarification proceedings," the NLRB was entitled to judgment as a matter of law. Board member Hunter dissented, concluding that the College of Arts and Sciences full-time faculty were managerial personnel, excluded from the National Labor Relations Act. The majority of the Board ordered that the University cease and desist engaging in unfair labor practices and, upon request, bargain with the Faculty Life Committee, the exclusive bargaining representative of the College of Arts and Sciences full-time faculty. The NLRB petitions this court to enforce this August 24 order of the Board. Lewis University counters that the Board's order is unenforceable because under *Yeshiva*, the full-time faculty members of the College of Arts and Sciences are managerial personnel, excluded from the National Labor Relations Act.[8]

## II

It is well-settled that this court, when reviewing a petition for enforcement of an NLRB order, is to examine the entire record and determine if there exists substantial evidence to support the Board's findings. *See* 29 U.S.C. § 160(e) (1982); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487, 71 S.Ct. 456, 463, 95 L.Ed. 456 (1951). In analyzing the entire record, we are to consider not only the evidence in favor of the Board's conclusions but also "the body of evidence opposed to the Board's view." *Universal Camera Corp. v. NLRB*, 340 U.S. at 488, 71 S.Ct. at 464. We realize, of course, that:

> "The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on

matters within its special competence or both."

*Id.* at 490, 71 S.Ct. at 466. *See also Southern Indiana Gas and Elec. Co. v. NLRB*, 657 F.2d 878, 882 (7th Cir.1981); *NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir.1977). The issue presented in the instant case is whether the record, when viewed in its entirety, contains substantial evidence to support the Board's majority decision that the full-time faculty of the College of Arts and Sciences at Lewis University are not managerial personnel and thus constitute an appropriate bargaining unit for purposes of the National Labor Relations Act.

The parties agree that the controlling legal analysis is set forth in the Supreme Court's *Yeshiva* decision. In that case, Yeshiva University operated five undergraduate and eight graduate schools within New York City. The Yeshiva University Faculty Association sought certification as the exclusive bargaining representative for the full-time faculty at ten of the thirteen schools. The University opposed this certification petition on the ground that the full-time faculty were managerial or supervisory personnel, excluded from the National Labor Relations Act.

The evidence introduced at the NLRB hearing revealed that the Board of Trustees at Yeshiva University had final authority in all school-related decisions. The University's central administration consisted of the president, four vice-presidents, and the Executive Council of Deans, a body composed of the academic dean from each school within the University. This central administration formulated University-wide policies, with the approval of the Board of Trustees, that included, *inter alia*, general guidelines for teaching loads, salary scales, tenure, sabbatical leaves, retirement, and fringe benefits. In addition, the academic dean of each school drafted a school-wide budget that was "subject to approval by the President after consultation with a

---

8. We note that for purposes of this enforcement proceeding, Lewis University does not contest the Board's ruling of December 16, 1982, that

the University is not a church-operated school. Accordingly, we express no view on this issue, as it is not properly before this court for review.

committee of administrators." *Yeshiva,* 444 U.S. at 675, 100 S.Ct. at 858. The faculty members at each of the thirteen schools convened regularly with their respective dean to "discuss and decide matters of institutional and professional concern." *Id.* at 676, 100 S.Ct. at 859. The evidence revealed that each of the thirteen schools was "substantially autonomous" and that "the faculty at each school effectively determine[d] its curriculum, grading system, admission and matriculation standards, academic calendars, and course schedules." *Id.* The faculty at each school also made recommendations to the dean in every case of faculty hiring, termination, promotion, tenure, and sabbaticals, and an "overwhelming majority" of these faculty recommendations were adopted by the central administration of the University. *Id.* at 677, 100 S.Ct. at 859.

Based upon the foregoing evidence, the NLRB found that "faculty participation in collegial decision making is on a collective rather than individual basis, it is exercised in the faculty's own interest rather than 'in the interest of the employer,' and final authority rests with the board of trustees." *Yeshiva University,* 221 N.L.R.B. 1053, 1054 (1975) (footnote omitted). Thus, the Board concluded that the full-time faculty at Yeshiva were professional employees entitled to collective bargaining representation under the National Labor Relations Act. The Supreme Court reversed the Board's decision, ruling that the full-time faculty at Yeshiva were managerial personnel, excluded from the Act.

The Supreme Court began its analysis with the fundamental definition of managerial personnel; those who " 'formulate and effectuate management policies by expressing and making operative the decisions of their employer.' " *Yeshiva,* 444 U.S. at 682, 100 S.Ct. at 862 (quoting *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 288, 94 S.Ct. 1757, 1768, 40 L.Ed.2d 134 (1974)). Typically, managerial personnel "represent[ ] management interests by taking or recommending discretionary actions that effectively control or implement employer policy." *Id.* at 683, 100 S.Ct. at 862. Indeed,

managerial personnel are excluded from the National Labor Relations Act to ensure that employees aligned with management will not divide their loyalties between the employer and the union. The Court, in applying these legal principles to the facts presented, concluded that "the faculty at Yeshiva University exercise authority which in any other context unquestionably would be managerial." *Id.* at 686, 100 S.Ct. at 864. According to the Court, the full-time faculty members':

> "authority in academic matters is absolute. They decide what courses will be offered, when they will be scheduled, and to whom they will be taught. They debate and determine teaching methods, grading policies, and matriculation standards. They effectively decide which students will be admitted, retained, and graduated. On occasion their views have determined the size of the student body, the tuition to be charged, and the location of a school. When one considers the function of a university, it is difficult to imagine decisions more managerial than these. To the extent the industrial analogy applies, the faculty determines within each school the product to be produced, the terms upon which it will be offered, and the customers who will be served."

*Id.* (footnote omitted). The Court added that:

> "The problem of divided loyalty is particularly acute for a university like Yeshiva, which depends on the professional judgment of its faculty to formulate and apply crucial policies constrained only by necessarily general institutional goals. The university requires faculty participation in governance because professional expertise is indispensable to the formulation and implementation of academic policy."

*Id.* at 689, 100 S.Ct. at 865.

The NLRB argued, nonetheless, that the decisions of the full-time faculty members were not managerial, but rather independent professional judgments exercised in

the faculty members' own interest. In response, the Supreme Court stated that "the faculty's professional interests—as applied to governance at a university like Yeshiva—cannot be separated from those of the institution." *Id.* at 688, 100 S.Ct. at 865. The NLRB further claimed that because the Board of Trustees at Yeshiva had final authority, the faculty's authority was merely advisory, not managerial. The Supreme Court disagreed, noting that "[u]ltimate authority ... has never been thought to be a prerequisite to supervisory or managerial status. Indeed, it could not be since every corporation vests that power in its board of directors." *Id.* at 685 n. 21, 100 S.Ct. at 863 n. 21. The Court added, "the fact that the administration holds a rarely exercised veto power does not diminish the faculty's effective power in policy-making and implementation.... [T]he relevant consideration is effective recommendation or control rather than final authority." *Id.* at 683 n. 17, 100 S.Ct. at 863 n. 17. Accordingly, the Court overturned the Board's finding—that the full-time faculty at Yeshiva University were entitled to collective bargaining representation under the National Labor Relations Act—because such a conclusion was neither "based on articulated facts" nor "consistent with the Act." *Id.* at 691, 100 S.Ct. at 867.

In the present case, the Board of Trustees has final authority in the management and operation of Lewis University. The administrative hierarchy at Lewis includes a president, two vice-presidents, and three academic deans, one representing each college. The College of Arts and Sciences consists of sixteen departments, each directed by a chairperson who is a faculty member elected by fellow faculty members within the department. The College of Arts and Sciences is governed by the "faculty convened," an assembly of all sixty-nine full-time faculty members within the college responsible for "the formulation of all major educational policies of the College and to determine the specific governance structure of the College." Findings of Hearing Officer, at 5 (October 31, 1980). *See also Lewis University*, 265 N.L.R.B. at 1251 (Van de Water, dissenting). The academic dean of the College of Arts and Sciences presides over the monthly meetings of the "faculty convened" but has no vote nor authority to veto a decision of the group. In formulating the educational policies of the college, the "faculty convened" receives input from the Educational Policies Committee, the Professional Status Committee, and the Budget Review Committee.[9] These committees, each comprised of six elected faculty members from within the college, submit proposals and recommendations to the entire college faculty at the monthly meeting of the "faculty convened."

The Educational Policies Committee is responsible for recommendations concerning academic governance, including, *inter alia*, "student admission and graduation requirements, grading guidelines and policies, majors, programs and courses to be offered, and curriculum changes." *Lewis University*, 265 N.L.R.B. at 1251 (Van de Water, dissenting). If a proposal of the Educational Policies Committee is accepted by the "faculty convened," it is forwarded to the University Academic Affairs Committee ("UUAC"), a body composed of members from the Educational Policies Committee of each college within the University. Once approved by the UUAC, the recommendation is sent to the University president for approval by the administration. The Board majority found that "there have been several occasions when the recommendations of the [Educational Policies Committee] have failed to attain acceptance by the administration," however, the Board cited to no examples in the record. *Id.* at 1246. Our independent review of the entire record reveals that be-

---

**9.** The record reveals that there is also a Faculty Life Committee within the College of Arts and Sciences, certified by the NLRB as the exclusive bargaining representative of the full-time faculty of the college. In addition, faculty members from the College of Arts and Sciences serve on the University-wide Student Union Advisory Board, Student Conduct Committee, Communications Advisory Board, and Teacher Education Committee.

tween 1973 and 1980, the "faculty convened" approved proposals of the Educational Policies Committee on issues of student admissions, graduation requirements, grading guidelines, curriculum changes, degree offerings, and academic calendar matters, and the University administration never rejected one of these proposals. *See* Findings of Hearing Officer, at 5 (October 31, 1980).

The Professional Status Committee formulates recommendations in the area of faculty tenure, promotions, and evaluations. If a recommendation of the Professional Status Committee is accepted by the "faculty convened," it is submitted to the administration for review by the academic dean, the vice-president, or the president. The record reveals that between 1972 and 1980, the "faculty convened" approved thirty-nine of the Professional Status Committee's recommendations for faculty tenure and the University president vetoed only three of those recommendations.[10] Additionally, between 1972 and 1980, the "faculty convened" approved seventy-nine of the Professional Status Committee's recommendations for faculty promotions and the University president vetoed only two of those recommendations. It is evident that by far, the overwhelming majority of the faculty tenure and promotion recommendations formulated by the Professional Status Committee and approved by the "faculty convened" have been implemented within the College of Arts and Sciences at Lewis University.

The Budget Review Committee reviews budgets prepared by departmental chairpersons and presents its findings to the "faculty convened," who vote on the budget and forward it to the University administration for final approval. *See Lewis University,* 265 N.L.R.B. at 1251 (Van de Water, dissenting). The Hearing Officer found that "[t]he Budget Committee is responsible for the review of the budgets as formulated by the department chairper-

sons. In doing so, it has ... made suggestions regarding cutbacks and the funding of certain programs. *As a rule, these suggestions are followed."* Findings of Hearing Officer, at 5 (October 31, 1980) (emphasis added). Thus, the full-time faculty of the College of Arts and Sciences at Lewis University exercise more control over the budgetary process than did the faculty members in *Yeshiva,* where "[t]he budget for each school [was] drafted by its Dean or Director, subject to approval by the President after consultation with a committee of administrators." *Yeshiva,* 444 U.S. at 675, 100 S.Ct. at 858.

The sixteen elected departmental chairpersons within the College of Arts and Sciences ensure that University policies and regulations are properly followed by the faculty members within their department. The chairpersons are evaluated by the academic dean of the college, pursuant to guidelines established by the Professional Status Committee and approved by the "faculty convened." In their role as departmental overseers, the chairpersons make recommendations to faculty members concerning teaching, testing, and grading methods; evaluate faculty members under a faculty-devised evaluation system and submit their conclusions to the University administration; make library requisitions; and advise faculty members, as well as students. The chairpersons also recommend faculty appointments, retentions, promotions, and salary increases to the University administration. When hiring a new faculty member to fill a vacancy within the department, the chairpersons receive initial authorization from the University vice-president to recruit applicants, and then the chairpersons independently interview, evaluate, and recommend candidates for the position. The chairpersons' recommendations are forwarded to the administration and, between 1971 and 1980, the Lewis University president did not reject a single

10. The record reveals that the president of Lewis University vetoed the Professional Status Committee's recommendation of tenure in one case for financial reasons, in another case be-

cause the faculty member had a terminal contract, and in the third case where the Committee offered only a conditional recommendation.

recommendation concerning the hiring of new faculty members. In addition, the chairpersons make recommendations to the academic dean of the college concerning sabbatical leaves and, since at least 1977, the dean has not rejected one of these recommendations.

Despite the clear, unambiguous faculty governance structure within the College of Arts and Sciences at Lewis University, a majority of the Board found that:

"the faculty members of the College of Arts and Sciences at Lewis University function in a role different from that of the faculty members at Yeshiva University. At Yeshiva University, the faculty exercised absolute or dominant authority in numerous critical areas including academic matters, hiring, tenure, sabbaticals, termination, and promotion. At Lewis University, the role of the faculty in these areas is neither absolute nor dominant. The faculty members either utilize their professional expertise and make routine recommendations or the policies are established and implemented pursuant to the master contract.

  *    *    *    *    *    *

Here, the faculty members in question have little discretion to perform their jobs independent of the Employer's established policy. Rather, the record indicates that the university administration's authority dominates the decisionmaking process. The dominance of administration decisionmaking authority is unequivocally articulated in the management-rights clause contained in the master contract which reserves to management 'all power, right, authority, duty and responsibility to and for the management and operation of the institution.'"

*Lewis University*, 265 N.L.R.B. at 1249–50. In sum, the Board majority attempts to distinguish the present case from the Supreme Court's *Yeshiva* decision on the basis that the full-time faculty of the College of Arts and Sciences at Lewis University do not exercise absolute or dominant authority. To support this clearly strained conclusion, the Board asserts that the full-

time faculty members merely exercise independent professional judgment; the college's policies are established and implemented pursuant to the expired collective bargaining agreement; and the University administration dominates the decisionmaking process, as evidenced by the management rights clause of the expired collective bargaining agreement. *See, e.g., Lewis University*, 265 N.L.R.B. at 1252 (Hunter, dissenting). A review of the entire record reveals that the evidence presented in this case fails to support the Board's misguided attempt to distinguish *Yeshiva*.

In *Yeshiva*, the full-time faculty at each of the university's thirteen schools met with their respective dean to determine the curriculum, grading system, admission and matriculation standards, academic calendar, and course schedule within the school. In addition, the faculty made recommendations to the dean concerning faculty hirings, terminations, and promotions, as well as tenure and sabbatical leaves. The evidence revealed that an "overwhelming majority" of these faculty recommendations were adopted by the central administration of Yeshiva University. *Yeshiva*, 444 U.S. at 677, 100 S.Ct. at 859. In view of this evidence, the Supreme Court reasoned that "the faculty at Yeshiva University exercise authority which in any other context unquestionably would be managerial." *Id.* at 686, 100 S.Ct. at 864. Thus, the Court concluded that the full-time faculty at Yeshiva were managerial personnel, excluded from the National Labor Relations Act.

Similarly, in the present case, the full-time faculty of the College of Arts and Sciences at Lewis University formulate and implement the major educational policies of the college. The faculty members govern the college through their collective participation in the "faculty convened," their membership on various faculty committees, and their elected positions as departmental chairpersons. The evidence introduced at the Board hearing reveals that the faculty determines student admission and graduation requirements, grading guidelines and

policies, courses and programs to be offered, and curriculum changes. Indeed, the Hearing Officer found that "[t]he faculty as a whole is responsible for the formulation of all major educational policies of the College and to determine the specific governance structure of the College. In doing so neither the Dean nor the administration has ever impeded that process." Findings of Hearing Officer, at 5 (October 31, 1980). In addition, the full-time faculty makes recommendations to the University administration in areas of faculty tenure, promotions, and evaluations, and an "overwhelming majority" of these recommendations are implemented within the College of Arts and Sciences at Lewis University. "When one considers the function of a university, it is difficult to imagine decisions more managerial than these." *Yeshiva*, 444 U.S. at 686, 100 S.Ct at 864.

The dissent claims that "[a]s for fiscal policy, the faculty plays a limited role in the budget process." A thorough review of the record reveals, however, that the full-time faculty of the College of Arts and Sciences have more input in and control over the budgetary process than did the faculty members in *Yeshiva*. According to the fiscal policy within the College of Arts and Sciences at Lewis University, the Budget Review Committee reviews budgets prepared by departmental chairpersons and presents its findings to the "faculty convened," who vote on the final budget and submit it to the University president for final approval. The Hearing Officer found that the Budget Review Committee "has made suggestions regarding cutbacks and the funding of certain programs. As a rule, these suggestions are followed." Findings of Hearing Officer, at 5 (October 31, 1980). In sharp contrast, the faculty members at *Yeshiva* exercised virtually no control over fiscal policy as "[t]he budget for each school [was] drafted by its Dean or Director, subject to approval by the President after consultation with a committee of administrators." *Yeshiva*, 444 U.S. at 675, 100 S.Ct. at 858. The dissent further asserts that, "while the faculty plays a vital role in defining academic policy, it is

the administration that effectively controls and implements policy." This independent conclusion, which finds no substantial support in the record, is in direct contradiction with the detailed findings of the Hearing Officer that the faculty members of the College of Arts and Sciences at Lewis University are "responsible for the formulation of all major educational policies of the College and to determine the specific governance structure of the College.... [N]either the Dean nor the administration has ever impeded that process." Findings of Hearing Officer, at 5 (October 31, 1980). The full-time faculty of the College of Arts and Sciences at Lewis University, just as the full-time faculty at Yeshiva University, clearly represent management interests by "taking or recommending discretionary actions that effectively control or implement" the educational policies of the college. *Id.* at 683, 100 S.Ct. at 862.

We add that the collegial decision making authority vested in the College of Arts and Sciences faculty at Lewis University is characteristic of many colleges and universities throughout the Nation. This system of faculty control over educational policies is partially rooted in:

"the medieval model of collegial decision-making in which guilds of scholars were responsible only to themselves. At early universities, the faculty were the school. Although faculties have been subject to external control in the United States since colonial times, traditions of collegiality continue to play a significant role at many universities...."

*Yeshiva*, 444 U.S. at 680, 100 S.Ct. at 861 (citations omitted). More importantly, faculty control and implementation of educational policies is founded upon principles of academic excellence and the need for freedom of thought and expression within institutions of higher learning. In the continual quest for academic excellence, universities must:

"provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail 'the four essential free-

doms' of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study."

*EEOC v. University of Notre Dame Du Lac,* 715 F.2d 331, 335 (7th Cir.1983) (quoting *Sweezy v. New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring)). Indeed:

 " '[o]ur nation is deeply committed to safeguarding academic freedom which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment.... The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection." *United States v. Associated Press,* 52 F.Supp. 362, 372 [1943].' "

*Id.* at 336 (quoting *University of California Regents v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978)).

 In the present case, the record establishes that the full-time faculty of the College of Arts and Sciences actively promote academic excellence and safeguard academic freedom at Lewis University by deciding who will teach, the subject matter to be taught, the curriculum guidelines, and the student admission policies within the college. The collegial decision making process that pervades a university, such as Lewis, clearly distinguishes the academic setting from the typical "management-employee relations that prevail in the pyramidal hierarchies of private industry." *Yeshiva,* 444 U.S. at 680, 100 S.Ct. at 861. For this very reason, the Board itself recognizes that, "principles developed for use in the industrial setting cannot be 'imposed blindly on the academic world.' " *Id.* at 681, 100 S.Ct. at 861 (quoting *Syracuse University,* 204 N.L.R.B. 641, 643 (1973)). Instead, the NLRB must carefully analyze and weigh the facts and circumstances of each case involving unit certification or un-

ion representation of university faculty members; exercising caution at all times so as not to interfere with or upset the delicate balance of the school's governing structure or its incentives for faculty advancement and tenure. In today's society, the typical private university is plagued with reductions in Federal assistance grants, spiraling educational costs, and a decreasing student enrollment. To effectively deal with these complex problems, private universities, such as Lewis, must call upon their knowledgeable and resourceful faculty to implement and control educational policies. It is only through this collegial decision making process that the university is able to effectively promote academic excellence, attract outstanding students, recruit and maintain a qualified faculty, and safeguard academic freedoms, all within the bounds of its financial resources.

The NLRB asserts, nonetheless, that the decisions made by the full-time faculty members of the College of Arts and Sciences are not managerial in nature but merely an exercise of independent "professional judgment." We reject the NLRB's argument as it reflects a lack of sensitivity to, and knowledge of, the unique characteristics of a truly academic setting. The record contains no evidence to suggest that the recommendations, decisions, and proposals of the full-time faculty are simply independent "professional judgments" made for personal interests rather than collegial decisions made for the overall good of Lewis University. Instead, the record reveals that the predominant policy at a small, private institution such as Lewis is to "operate a quality institution of higher learning that will accomplish broadly defined educational goals within the limits of its financial resources." *Yeshiva,* 444 U.S. at 688, 100 S.Ct. at 865. To accomplish its educational objectives, Lewis University must depend upon "the professional judgment of its faculty to formulate and apply crucial policies constrained only by necessarily general institutional goals. The university requires faculty participation in governance because professional expertise

is indispensable to the formulation and implementation of academic policy." *Id.* at 689, 100 S.Ct. at 865. When the College of Arts and Sciences full-time faculty members formulate and implement policies to promote the objectives of Lewis University, they improve the academic quality of the college, which in turn, improves the professional status and reputation of the faculty as well as the educational opportunities for students. As a result, the full-time faculty's professional interests—as applied to governance at a university such as Lewis—cannot be separated from those of the institution.

The NLRB further asserts that the guidelines for faculty course loads, salaries, promotions, and tenure at Lewis University were specifically established in the collective bargaining agreement that expired in August 1978. The NLRB thus argues that University policy on these matters is a product of the expired collective bargaining agreement, not a result of the decisions and recommendations made by the full-time faculty of the College of Arts and Sciences. We summarily dismiss the NLRB's claim because the evidence presented at the Board hearing unequivocally established that the full-time faculty members submitted recommendations to the administration concerning faculty tenure, faculty promotions, and curriculum changes and that an overwhelming majority of these recommendations were adopted and implemented in the College of Arts and Sciences at Lewis University. Indeed, between 1973 and 1980, the administration accepted well over ninety percent of the tenure recommendations, ninety-five percent of the promotion recommendations, and one hundred percent of the curriculum changes submitted by the "faculty convened." The existence of an expired bargaining agreement that provides guidelines for course loads, salaries, promotion, and tenure is of no consequence, for as the Board itself has properly recognized, "we must look to the extent of managerial authority held by college faculties rather than the manner in which such authority was obtained." *College of Osteopathic Medicine,* 265 N.L.R.B. 295, 298 (1982).

The NLRB also claims that the decisions of the College of Arts and Sciences full-time faculty are merely advisory because the University administration and the Board of Trustees have final authority, as expressed in the management rights clause of the expired collective bargaining agreement. In *Yeshiva,* the Supreme Court dismissed a similar argument stating, "the fact that the administration holds a rarely exercised veto power does not diminish the faculty's effective power in policymaking and implementation." 444 U.S. at 683 n. 17, 100 S.Ct. at 863 n. 17. According to the Court, "the relevant consideration is effective recommendation or control rather than final authority." *Id.* In the present case, the full-time faculty of the College of Arts and Sciences not only exercise effective recommendation and control of the educational policies within the college, but as an integral part of their college governance responsibilities, the faculty members actually formulate and implement the educational policies of the college.

We add that the Tenth Circuit's recent opinion in *Loretto Heights College v. NLRB,* 742 F.2d 1245 (10th Cir.1984) (*"Loretto Heights"*), does not alter our conclusion. In *Loretto Heights,* the court observed that:

> "Unlike *Yeshiva,* where each school's faculty apparently met and decided most academic matters as a collective body, *the faculty at Loretto Heights participates in such matters primarily through its representation on a number of committees.* These committees vary widely both in terms of their own significance and in the scope and effect of the role afforded the faculty representatives. Some committee work, for example, is of a minor nature in comparison to the other functions routinely performed by the faculty.... Thus, while these committees may in fact perform important functions, the extent of faculty involvement in the committees' work is so limited as to be 'only incidental to,

or in addition to, their primary function of teaching, research, and writing,' rather than truly managerial in nature."

*Id.* at 1252–53 (citations omitted) (emphasis added). Thus, contrary to the facts in the present case, Loretto Heights College did not have a "faculty convened" that approved proposals and recommendations emanating from the faculty committees.[11] Instead, the proposals of faculty committees at Loretto Heights were submitted directly to the administration and underwent several levels of administrative review. The court in *Loretto Heights* found that "faculty power at the College, whatever its extent on paper, is in practice severely diluted," as evidenced by the infrequent, insignificant work of faculty committees, the faculty's limited decision making authority, and the several layers of administrative review. *Id.* at 1254.

■ In stark contrast, the evidence presented in this case reveals that the full-time faculty of the College of Arts and Sciences at Lewis University have substantial authority, responsibility, and control of the formulation and implementation of educational policies within the college. The full-time faculty, through their collective participation on faculty committees, as departmental chairpersons, and as members of the "faculty convened," determine student admission policies, graduation requirements, grading guidelines, curriculum changes, degree offerings, academic calendar matters, faculty tenure, faculty promotions, and faculty hirings within the college. Thus, the faculty governance structure within the College of Arts and Sciences is clearly distinguishable from the very limited faculty participation in the governance of Loretto Heights College. In view of this clear distinction, the dissent's

assertion that our disposition of this case "creates a conflict with the Tenth Circuit" has no basis in law or fact. Indeed, a review of the entire record reveals that the College of Arts and Sciences full-time faculty are managerial personnel who " 'formulate and effectuate management policies by expressing and making operative the decisions of their employer.' " *Yeshiva*, 444 U.S. at 682, 100 S.Ct. at 862 (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. at 288, 94 S.Ct. at 1768). Accordingly, we hold that the record, when viewed in its entirety, does not support the Board's decision that the full-time faculty within the College of Arts and Sciences at Lewis University constitute an appropriate bargaining unit for purposes of the National Labor Relations Act. Rather, the evidence establishes that the full-time faculty members, just as the faculty members in *Yeshiva*, are managerial personnel excluded from the Act.

### III

We deny enforcement of the Board's order.

SWYGERT, Senior Circuit Judge, dissenting.

The Board found that the "university administration's authority dominates the decisionmaking process." *Lewis University*, 265 N.L.R.B. 1239, 1250 (1982). Because this judgment is supported by substantial evidence, I would enforce the Board's order dismissing the University's petition to exclude faculty from the bargaining unit. The majority's conclusion to the contrary is based on its own independent—and questionable—review of the record and creates a conflict with the Tenth

---

**11.** The dissent notes that the full-time faculty at Loretto Heights College were members of the Academic Forum, "a college-wide self-governing body comprised of all full and part-time faculty, including program directors." *Loretto Heights,* 742 F.2d at 1249. The language of the Tenth Circuit opinion in no way suggests that the Academic Forum approved all proposals and recommendations emanating from the faculty committees, as does the "faculty convened" in

the present case. Instead, pursuant to the Academic Forum by-laws, the faculty members at Loretto Heights College may simply *"make recommendations* to appropriate committees or administrators on a variety of subjects...." *Id.* (emphasis added). Thus, in direct contrast to the facts in the present case, the court in *Loretto Heights* concluded that "faculty power at the College, whatever its extent on paper, is in practice severely diluted." *Id.* at 1254.

Circuit, which recently enforced a similar order under virtually identical circumstances. *See Loretto Heights College v. NLRB*, 742 F.2d 1245 (10th Cir.1984).

Although viewed by some as the death knell for faculty unions, *e.g., Note,* 14 Creighton L.Rev. 657, 676–77 (1981), the Supreme Court's decision in *NLRB v. Yeshiva University*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980), did not adopt a per se rule defining university faculty as "managerial" employees, who are not protected by the National Labor Relations Act, *codified as amended at* 29 U.S.C. §§ 151–69 (1982) ("the Act"), *see NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). Rather, the Court consigned this issue to case-by-case adjudication before the Board, *see Yeshiva*, 444 U.S. at 689–90 n. 29, 690 & n. 31, 100 S.Ct. at 865–66 n. 29, 866 & n. 31, perhaps the wisest course in view of empirical evidence that faculty power varies widely among American universities, *see generally* Suntrup, *NLRB v. Yeshiva University and Unionization in Higher Education,* 4 Ind. Rel.L.J. 287, 299–302 (1981). Unlike the proceedings in *Yeshiva,* the Board in this case cannot be faulted for failing to undertake an extensive review of the record or to render specific findings of fact. *See Yeshiva,* 444 U.S. at 678, 691, 100 S.Ct. at 860, 867. Nor can it be faulted for applying an incorrect legal test. *See id.* at 687–88, 100 S.Ct. at 864–65. Accordingly, we owe the Board's judgment great deference, and our review is limited to determining whether its findings were supported by substantial evidence. *See id.* at 691, 100 S.Ct. at 867; *Local 1384, UAW v. NLRB,* 756 F.2d 482, 486 (7th Cir.1985).

In *Yeshiva,* 444 U.S. at 683, 100 S.Ct. at 862, the Court defined a managerial employee as one who "represents management interests by taking or recommending discretionary actions that effectively control or implement employer policy." In finding the Lewis faculty to be managerial, the majority stresses the indispensability of the faculty's professional judgment in formulating and implementing academic policy. That faculty input is vital does not necessarily render the faculty managerial; the faculty members could just as well be characterized as indispensable professional employees. The majority ignores the tension between the Act's implicit exclusion of managerial employees and its explicit inclusion, *see* 29 U.S.C. § 152(12), of professional employees whose work "involv[es] the consistent exercise of discretion and judgment." If the managerial exclusion is defined too broadly, the Act's mandate to protect professional employees will be undercut. Recognizing this tension, *see Yeshiva,* 444 U.S. at 686, 100 S.Ct. at 864, the Supreme Court decided that a professional employee becomes "managerial" only if his or her discretionary power is so great as to "effectively control or implement employer policy." *Id.* at 683, 100 S.Ct. at 862.

Fairly read, the record lends substantial support to the Board's conclusion that at Lewis University, a large administrative hierarchy controls and implements academic as well as fiscal policy. Although faculty input and expertise are indispensable in some circumstances, the faculty plays largely a passive role and is dominated by the administration.

As for fiscal policy, the faculty plays a limited role in the budget process. The department chairman, a member of the bargaining unit, commences the process by completing a budget request form. But the chairman does so only in accordance with guidelines set by the administration, and then the Dean reviews the budget and resolves any disagreements. Transcript of Proceedings at 204–05 ("T."). After various layers of administrative review, a university budget is compiled. *See Lewis University*, 265 N.L.R.B. at 1246. At this point, the faculty is again called into the budget process through the Budget Review Committee. The Committee merely reviews the budget in its final form and offers suggestions. Although these suggestions are "generally" followed by the administration, T. 206, the faculty is not in a position, at this late date in the process, to rewrite the budget or to offer major policy initiatives. Rather, Dean Mascari

characterized the Committee as primarily an "information-sharing" and "communication" device. T. 209. The Board was therefore justified in concluding that the faculty does not "have the ability to formulate and effectuate university [budget] policy." *Lewis University*, 265 N.L.R.B. at 1246.

As for academic policy, the majority stresses the collegial authority the faculty wields through the Educational Policies Committee and the "Faculty Convened," a committee composed of all members of the faculty. It is true that these deliberative bodies recommend a variety of academic policies that are generally adopted by the administration. Yet, substantial evidence supports the Board's conclusion that while the faculty plays a vital role in defining academic policy, it is the administration that effectively controls and implements policy. The record reveals that the most important academic policy decisions are made at the initiative of the administration and often in spite of faculty resistance. And the administration maintains control over more routine matters by subjecting faculty decisions to various layers of administrative review and by virtue of its control over finances.

With respect to the curriculum at Lewis University, it is true that the faculty has approved all the graduation and admissions requirements listed in the catalogue. But the graduation requirements were formulated by an ad hoc curriculum study group dominated by the administration, *see infra* at 630; *see also* T. 274. As for admissions criteria, the requirements have not been changed for some time, and the record does not indicate whether the faculty initiated the most recent changes or simply acquiesced to them. T. 363–64. Moreover, the committee that actually decides who to admit is composed of administrators, not faculty. T. 364.

The record also shows that the more important the curriculum change, the less influence exerted by the faculty. In re-

sponse to a fiscal emergency, the administration unilaterally eliminated the modern languages major, despite a resolution by the Educational Policies Committee that "no further cuts in faculty membership or programs be made."[1] Employer's Exhibit 27 at 22; T. 282–84. Similarly, the Dean unilaterally cancelled one course and one section of a course in the music department. T. 493–96. When the faculty was consulted and did approve major policies, such as the addition of a science degree and a writing requirement, the faculty's recommendation was subjected to four layers of administrative review: the Dean, the Vice-President for Academic Affairs, the President, and the Board of Trustees. T. 249, 274, 374.

The only instance apparent from the record where the faculty initiated a major academic policy decision, as opposed to passively reacting to events, was the institution of a writing requirement. T. 274. The history of the most recent curriculum reform is demonstrative of faculty passivity. The impetus for reform came from the administration, not the faculty. T. 446. Instead of referring the matter to the Educational Policies Committee, the President, with the authorization of the Board of Trustees, appointed an ad hoc commission to study the matter. T. 447, 483–84. Only three or four of the eleven members of the commission were part of the bargaining unit. T. 483–84. The Academic Vice-President could not recall whether the Educational Policies Committee was ever consulted by the commission. The faculty did offer several suggestions, some of which were rejected by the administration. T. 451, 455–56. Eventually, the Faculty Convened approved the curriculum reform. T. 451.

It is true that faculty members exercise substantial discretion and authority in conducting their classes and research. Yet, "professors may not be excluded [as managerial] merely because they determine the content of their own courses, evaluate their

---

**1.** I therefore disagree with the majority's suggestion that the University has never rejected a proposal approved by the Educational Policies Committee. *Ante at* 622–623.

own students, and supervise their own research." *Yeshiva*, 444 U.S. at 690–91 n. 31, 100 S.Ct. at 866–67 n. 31. Such authority is considered to be the "routine discharge of professional duties," not managerial. *Id.* at 690, 100 S.Ct. at 866. Moreover, at Lewis University, even this academic freedom is circumscribed by the administration. Although faculty members, in cooperation with the department chairmen, are responsible for the content of courses, the Dean may review all courses and recommend modifications. Disagreements between the Dean and the faculty members are resolved by the Academic Vice-President, subject to appeal to the Executive Vice-President. *Lewis University*, 265 N.L.R.B. at 1242. Although faculty members are free to conduct research as they please, the time and money necessary for successful research is controlled by the administration: sabbaticals, research grants, and reduced teaching loads are available solely at the discretion of the Deans, the Academic Vice-President, and the President. *Id.* at 1243.

I concede that the majority is on strong ground in concluding that the faculty effectively controls important personnel decisions. With very few exceptions, it is the faculty who determines who is hired and who is tenured. *See ante* at 623. This power is subject to some limitations, however. The faculty does not control appointments to nonfaculty positions. Although on two occasions the faculty offered advisory opinions as to who to select for high administrative positions, its advice was not followed in either instance. *Lewis Univer-*

*sity*, 265 N.L.R.B. at 1244. Nor does the faculty have absolute control over the status of nontenured faculty, as shown by the Dean's unilateral decision in 1974 to terminate two nontenured faculty in the education department. T. 270–71. Even with respect to tenured members, the faculty's power to control personnel decisions is constrained by the administration's control of finances. Thus, during the 1978 fiscal crisis, the administration unilaterally terminated four tenured professors in the modern languages department. Employer's Exhibit 27 at 26. And, even in the best of times, a faculty member cannot be hired without a decision by the administration to appropriate the necessary funds. In addition, the administration does exercise some control over more systemic concerns, such as affirmative action and hiring strategies. *Lewis University*, 265 N.L.R.B. at 1244.

Nevertheless, the specific personnel who are hired and then tenured are effectively chosen by the faculty. In this respect, the case at bar is indistinguishable from *Yeshiva*. Yet the majority fails to explain why this particular similarity should control the result, especially given the contrast between the across-the-board power wielded by the Yeshiva faculty and the relative weakness of the Lewis faculty in nonpersonnel matters.[2] In order to decide this question, it is necessary to determine what result would be most consistent with the policies behind the Act's simultaneous exclusion of managerial employees and inclusion of professional employees.

---

2. A strong argument can be made that authority over personnel matters is enough to require exclusion from the bargaining unit because such authority renders the employee a "supervisor" within the meaning of 29 U.S.C. § 152(11). To be sure, the Act defines "supervisor" to include employees with "authority" to "hire ... promote, ... reward, or discipline." *Id.* Yet, as this court noted in *NLRB v. Res-Care, Inc.*, 705 F.2d 1461, 1465 (7th Cir.1983), this seemingly broad definition of supervisory status is limited by the last clause of 29 U.S.C. § 152(11): "... if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." Thus, professional employees

who exercise the supervisory powers listed in section 152(11) are not supervisors if they do so pursuant to the "*routine* discharge of professional duties." *See Yeshiva*, 444 U.S. at 690, 100 S.Ct. at 866 (emphasis added).

The distinction, and tension, between the exclusion of supervisors and inclusion of professional employees is governed by the same policies that distinguish managerial from professional employees. *See id.* at 682, 100 S.Ct. at 862. The same reasons that lead me to conclude that the Lewis faculty is composed of professional rather than managerial employees also lead me to conclude that faculty members are professional employees rather than supervisors. *See infra.*

As the majority notes, the policy behind the managerial exclusion is to prevent a conflict of interests. *Ante* at 621. Yet it is important to define precisely what this conflict is. If managerial employees are powerful enough to "effectively control" policy, then they *are* the employer. Consequently, they can no more divide loyalties between the employer and the union than they could between *themselves* and the union. Division of loyalties is a problem, then, only because management owes a fiduciary duty to a third party: ownership. Management's duty is to bring together the ownership's capital and the employees' labor in order to produce goods and services *for the benefit of ownership.* This duty cannot be discharged if management allies itself with labor.

Yet, if the Act was in this sense intended to preserve ownership's control over the means of production, *cf.* Klare, *Labor Law as Ideology: Toward a New Historiography of Collective Bargaining Law,* 4 Ind. Rel.L.J. 450 (1981), it was also intended to cure the excesses of the unregulated market by encouraging labor to organize to protect its interests and by democratizing the workplace. Thus, Professor Meltzer has concluded that a "commitment to democracy [was] central to the rationale for unionization and collective bargaining ... [O]f all the considerations that [were] invoked in favor of legal protection of unions in the 1930's, their contribution to industrial democracy remained the most widely accepted justification." B. Meltzer, *Labor Law: Cases, Materials & Problems,* 1117–18 (2d ed. 1977). By expressly extending the protection of the Act to professional employees,, Congress recognized that white collar professionals as well as manual laborers could be sufficiently divorced from the management of production and sufficiently victimized by the power of management to merit protection.

The only potential conflict of interest in the case at bar is that the faculty will use its power to hire and grant tenure to reward union sympathizers. There are two reasons to believe that this potential conflict does not in fact deprive ownership, i.e.,

the Board of Trustees, of its control over the enterprise. First, despite several years of union representation, the University can cite no specific manifestation of such a conflict. Second, the very reason why the University chooses to grant the faculty power over personnel decisions indicates that the power will not be abused. Dean Mascari testified that deference to the faculty, particularly the faculty of the relevant department, is necessary because the faculty is in the best position to assess professional competence, the primary consideration in any hiring decision. T. 332–33. It can reasonably be concluded from this that the faculty's sense of professionalism as well as its desire to preserve its prestige would prevent it from allowing union loyalties to cloud its judgment of academic competence. Thus, the faculty's discretionary power in personnel matters can best be characterized as the "routine discharge of professional duties," *Yeshiva,* 444 U.S. at 690, 100 S.Ct. at 866, rather than as a species of managerial power that creates a conflict of interests.

On the other hand, industrial peace, and consequently the well-being of the employer, would be threatened if the protections of the Act were withdrawn. The majority contents itself with the observation that in these trying times for universities, we should take care to encourage the "collegial decisionmaking process." *Ante* at 626. I was not aware that Congress viewed unionization as a threat to the health or morale of any enterprise. On the contrary, the Act assumes that unionization and the protections of the Act are in the long-term interests of industry as well as labor because only in this way can industrial peace be maintained. *See* 29 U.S.C. § 151 (1982). Here, considerable tensions have caused the faculty at Lewis University to organize. Instead of inhibiting the University in coping with trying times, the Act has ensured that disputes between the faculty and the administration have been resolved amicably, rather than on the streets. Thus, the administration's elimination of the modern languages department

and the resulting termination of four tenured professors did not lead to a strike or other labor disturbance that would have disrupted the University. Rather, because of the collective bargaining relationship fostered by the Act, the dispute was resolved by peaceful arbitration.

The decisive question in cases such as the one at bar is whether the union threatens ownership's control of the enterprise by depriving it of a loyal managerial hierarchy. Substantial evidence supports the Board's conclusion that this is not a problem at Lewis University. Ownership's interests are more than adequately protected by a loyal administrative bureaucracy that dominates decisionmaking, yet which, as sound management theory would seem to dictate, solicits and relies on faculty expertise.[3]

The Board's decision is also supported by recent precedent. In *Loretto Heights,* 742 F.2d 1245, the Tenth Circuit enforced the Board's recognition and protection of a faculty union at a Denver College with a similar size, governance structure, and religious orientation as Lewis University. The majority distinguishes this case on the ground that the Loretto Heights faculty lacked a plenary faculty body similar to the Faculty Convened at Lewis University. *Ante* at 627–628. Yet the Tenth Circuit noted in that case that a committee of all the faculty, entitled the "Academic Forum," regularly met to discuss "academic policy and other matters of interest" and made "recommendations to appropriate committees or administrators on a variety of subjects." *Loretto Heights,* 742 F.2d at 1249. Although we are not bound by the Tenth Circuit's decision, intercircuit conflicts should not be created lightly, and at the very least we should frankly acknowledge when we depart from the law of other circuits.

Because the Board's decision is supported by the record evidence, as well as by precedent and policy, I would enforce its order.

---

**3.** This conclusion is consistent with empirical evidence that strong faculty influence is not associated with small, teaching-oriented institutions like Lewis University. Rather, the administration's control is most likely threatened in large, prestigious, research-oriented institutions. The locus of power in such institutions tends to be largely autonomous departments, and faculty members are able to wield enormous power by virtue of their prestige, high morale, and tradition. *See generally* Suntrup, *supra,* 4 Ind.Rel. L.J. at 298–302.