## FOR PUBLICATION



**FILED**
Sep 05 2014, 10:07 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOHN S. (JAY) MERCER**
Mercer Belanger
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**FREDERICK S. BREMER**
ICRC Staff Counsel
Civil Rights Commission
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CARDINAL RITTER | ) | |
| HIGH SCHOOL, INC., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No.  93A02-1401-EX-47 |
| | ) | |
| ALEESHA BULLOCK, | ) | |
| | ) | |
| Appellee-Complainant. | ) | |

APPEAL FROM THE INDIANA STATE CIVIL RIGHTS COMMISSION
The Honorable Noell F. Allen, Administrative Law Judge
Docket No. EDra08010034

**September 5, 2014**

**OPINION–FOR PUBLICATION**

**BAKER, Judge**

Cardinal Ritter High School, Inc. (Ritter) appeals the determination of the Administrative Law Judge (ALJ) for the Indiana Civil Rights Commission (ICRC) finding that Ritter violated the Indiana Civil Rights Law (ICRL) when it did not select appellee-complainant Aleesha Bullock as a member of the girls' varsity basketball team. Ritter argues that, as it is a private, religious institution owned and operated by the Roman Catholic Archdiocese of Indianapolis, the ICRL is not applicable. Also, Ritter contends that the findings of fact and conclusions of law issued by the ALJ are unsupported by substantial evidence and maintains that the $25,000 award to Bullock for emotional damages is based on speculative evidence. We find that the ICRC has jurisdiction over the girls' basketball team at a private, religious institution. However, we conclude that when, as here, the case hinged entirely on the credibility of the witnesses, the issuance of an order by an ALJ who did not hear the evidence or observe the witnesses is not in accordance with law, is contrary to the constitutional rights of the parties, and is without observance of procedures required by law. Therefore, we vacate the order of the ICRC and remand with instructions to conduct a new hearing and issue a timely ruling.

FACTS

At the time the original complaint was filed, Ritter was a ministry of the Roman Catholic Archdiocese of Indianapolis. Bullock, who is African-American, attended Ritter and played on the girls' varsity basketball team during the academic year of 2006-2007. At that time, she was the team's highest scorer.

However, Bullock was not selected to play for the varsity basketball team for the 2007-2008 term. The basketball coaches, including Coach William Clark, felt that Bullock had shown a lack of commitment to the basketball program because she had chosen to play soccer rather than attend basketball conditioning. Clark told Bullock's parents that she was not chosen to play because many younger players were improving at a faster rate and better fit with the way he wanted to develop the team in the future.

On January 9, 2008, Bullock's mother, Myrna Bullock, filed a complaint against Ritter, alleging that Ritter had violated the ICRL. The complaint alleged that Ritter had cut Bullock from the varsity basketball team because of her race. Ritter filed its answer on February 8, 2008, and denied that the ICRC had subject matter jurisdiction. It also refuted Bullock's claim that she was not selected for the team due to her race, maintaining that Bullock was not chosen for the team due to concerns over her level of improvement and commitment to the basketball program.

On October 21, 2009, ICRC Deputy Director Joshua Brewster determined that there was not probable cause to believe that an unlawful discriminatory practice occurred. Myrna Bullock initiated an appeal. On May 12, 2011, the ICRC reversed the finding of no probable cause. At this point, Bullock, who was now of legal age to bring the complaint on her own behalf, was substituted as the complainant.

On May 23, 2012, a hearing was held before ALJ Robert Lange. At the hearing, Bullock's parents testified that Clark provided them with the following reasons for cutting Bullock: 1) he was concerned about her commitment to the team due to the fact

3

that she had consistently failed to attend summer basketball conditioning; 2) younger players were playing at or above Bullock's level; 3) he was choosing players who would help to develop the team for the future; and 4) Bullock had not played at her usual level at summer camp or at tryouts.

When Clark testified at the hearing, the following exchange took place:

Q: Is it true that at the meeting at the end of the tryouts – one of those meetings – it was considered by you whether to let Aleesha to be on the team but with the idea that she would not be playing very much?

A: I think as a coaching staff I think you have to decide everything. If this player is not playing a lot, how does it affect this other player? If this player is not selected, how does that affect the other players? So as far as consideration, we considered that for all of our players, the ones that we selected and the ones that we did not select.

Q: Is it not true that in Aleesha's situation you were not dissuaded from letting her on that team in that capacity because of a personality conflict of some sort with Samantha Lynch.

A: I would say Aleesha's personality conflicts with members of the team would deal with the team chemistry issue. So in the selection of the team process, team chemistry or how the team gels together is considered. Like we mentioned before.

Q: But do you agree that that was – what I think you testified to in your deposition – that that held you back from deciding to let Aleesha be on that team or even sitting on the bench?

A: Well I think sitting on the bench during a game has little to do with if you're on the team or not. You're talking about at everyday practices, how are they going to be having this player here, how is it going to be not having that player here. How is this team going to gel based on the group you have in practice. Whether you bring up players from the JV or don't even select as a player on the team, that's how the team gels. So did that have a decision? It had a decision on how we selected our team. We

wanted to choose the team that would gel the most and also produce the most wins for us.

Administrative Hearing Tr. p. 276-278.

The decision not to allow Bullock on the team in a limited-play basis was discussed further:

Q: Did you understand when you were answering these questions or making these statements that I was inquiring as to whether or not when you had these meeting after the tryouts, whether or not the alternative, which has been discussed much today, of letting Aleesha have the chance of letting Aleesha be a member of the team with the thought that she might not be able to play as much as, maybe, she expected.

A: Was that considered?

Q: Yes.

A: That was considered for all the girls we cut.

Id. at 282.

ALJ Lange retired before making a ruling on the case. The commission then appointed Noell F. Allen as ALJ for the ICRC on July 2, 2013. ALJ Allen filed her Proposed Findings of Fact, Conclusions and Order on July 19, 2013, finding that the ICRC had jurisdiction over Bullock's complaint as she was excluded from an opportunity relating to education. ALJ Allen concluded that Ritter had violated the ICRL by cutting Bullock from the girls' basketball team due to her race and ordered Ritter to pay Bullock $75,000.

Ritter filed its objections to the Proposed Findings of Fact, Conclusions and Order on August 2, 2013. ALJ Allen's findings of facts included the following:

5

. . .

2. Bullock is African American.

3. While enrolled as students of Ritter during their senior school year spanning 2007-2008, both Bullock and Samantha Lynch ("Lynch") tried out for inclusion as members of the Varsity Team to that they could play on that team during the 2007-2008 basketball season.

4. While Lynch was accepted as a member of the Varsity Team by the coach, William Clark ("Clark"), he denied Bullock a place on the team even on a limited-play basis. The final decision was Clark's.

5. Clark who testified at the hearing is Caucasian.

6. During the Varsity Team's basketball seasons corresponding to Bullock's and Lynch's sophomore and junior years, both of them were members of the Varsity Team. Bullock typically played as a point guard and Lynch played as a two guard but they played these positions interchangeably.

7. In her sophomore year, Bullock was the leading scorer of the Varsity Team. And by the end of that season Bullock was awarded a [plaque] recognizing her as having the highest number of steals and the second highest number of assists.

8. In their junior (2006-2007) year together on the Varsity team, Bullock and Lynch for the entire basketball season scored 235 and 151 total points respectively, they made 20.68 points and 6.86 points respectively per game, their field goals to field foals attempted were 40.8 percent and 29.3 percent respectively, and their free throw to free throws attempted were 38.4 percent and 44.4 percent respectively. Their turnover rates for the season were 18 and 115 respectively.

. . .

12. Clark ultimately explained barring Bullock from membership on the Varsity Team even in a limited role capacity, saying this was because of Bullock not getting along with other players, the only one of which Clark specified was Lynch. However, at a meeting with Bullock's parents, he told them his reasons had to do with younger players already playing as well as Bullock and that their participation in the Varsity Team best fit in with his development of a better team in the future.

6

13. Clark has admitted girls to membership on Ritter's girl's junior varsity basketball team with the express understanding that they would not be put in play very much. He could have done the same for Bullock and even considered the possibility of doing so. In competitive play, Clark even allowed Kara Curtis, a member of the junior varsity team to [don] the varsity team uniform and play as a part of that team at times.

. . . .

18. It is reasonably inferred that by Bullock not being made a member of the Varsity Team during her senior year, this negatively affected Bullock's chances to be recruited by colleges looking to place promising high school basketball players on their teams with tuition and other costs funded by scholarships. Nonetheless, Bullock signed the form that authorized Ritter to release basketball statistics to inquiring colleges, but as it turned out the full expense for the first year at Indiana State University and the final three years at Trine University fell on her and her parents. For the payment of this Bullock incurred $25,000 in debt, and her parents incurred $63,000.

19. Bullock suffered emotional distress due to being excluded from membership on the Varsity Team during her senior year. She cried when she told her parents what had happened. She found herself unable to continue attending Varsity Team games as a spectator during her senior year because she cried so much the times she did attend. She avoided trying out to be on college basketball teams out of a fear of just being rejected again to her humiliation. The experience caused her to [doubt] herself and to feel betrayed. She only . . . seemed to regain some [self-confidence] by securing medication when she came of age.

Appellant's App. p. iv-viii.

Additionally, ALJ Allen's conclusions of law included the following:

. . .

11. There was a prima facie showing by a preponderance of the evidence that Ritter preferentially admitted the Caucasian Lynch to and excluded the African American Bullock from the Varsity Team for the 2007-2008 basketball season. This is evidenced by the fact that for the immediately preceding 2006-2007 season, Bullock bested Lynch in all of the major statistical categories and dramatically so in the case of total points for the

7

whole season, Bullock having scored 84 more points than Lynch scored, making her the second highest scorer on the Varsity Team.

12. Once the prima facie case of unlawful discrimination is proven, it gives rise to a presumption of discrimination and shifts the burden of production to the respondent to rebut the presumption. St. Mary's Honor Center v. Hicks, 589 U.S. 5012, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). In short, it becomes [the] respondent's burden to produce evidence that the adverse action in question was taken for a legitimate, nondiscriminatory reason. St. Mary's, supra.

13. Ritter rebutted the presumption of discrimination by articulating a nondiscriminatory reason for Clark denying Bullock Varsity Team membership on just a limited-play basis during the 2007-2008 season; Clark explained the denial, saying it was because Bullock did not get along with Lynch and with other albeit unnamed team members.

14. Upon Ritter's articulation of the nondiscriminatory reason, Bullock assumes the burden to prove that the adverse decision was the result of intentional discrimination based on an impermissible discriminatory motive (Burdine, supra, 450 U.S. at 256). This may be done indirectly by showing that the stated reason for the adverse action was a pretext for the sort of discrimination prohibited by law, meaning proof that the given reason was false and the real reason was discrimination. St. Mary's Honor Center v. Hicks, supra, 113 S. Ct. At 2752 n. 6. However, these two aspects of the requisite level of proof may be simply realized in one step for the United States Supreme Court has determined that the ultimate fact of discrimination may be inferred from the falsity of the nondiscriminatory explanation. Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2108 (2000).

15. Bullock proved that Ritter's articulated reason for denying her membership in the Varsity Team on a limited-play basis was a pretext for discrimination, that it was likely false, on account of the following:

a. Very soon after Ritter denied Bullock membership on the Varsity Team in her senior year, Clark's explanation to Bullock's parents of why he made the decision to not admit Bullock to the Varsity Team included no reference to Bullock's relationship to Lynch or other team members. This supports a conclusion that Clark was not really

8

motivated to deny Bullock membership on the basis of any conflict between her and Lynch and the other Varsity team members.

b. The evidence of the highly subjective quality of Clark's reason for denying Bullock membership in the Varsity team on a limited-play basis [sic]. Outside of Lynch, he did not even name the other team members with whom Bullock was supposed to have had a bad relationship[,] much less specify any factual basis for such conclusions regarding these unnamed persons. And Ritter's only specially stated evidence of Bullock and Lynch not getting along with each other were the statements of Joy Hoy. She is the principal of Ritter. In addition to just generally and subjectively saying that Bullock and Lynch did not get along, she specified that Lynch told her she wanted to be transferred out of Ritter as a consequence of Bullock's treatment of her. However there was no evidence by way of testimony of Hoy or by any other means indicating that when Clark denied Bullock membership on the Varsity Team he was aware of Hoy's specific information and/or that Hoy had shared this information with Clark. At best, Clark testified that he subjectively "thought" that Bullock said something that made the relationship between Bullock and Lynch not a good one.

16. In that Ritter's and Clark's reason for denying Bullock membership on the Varsity Team in even just a limited role is a pretext for discrimination on the basis of race contrary to the Indiana Civil Rights Law, Bullock sustained her burden of proving that Ritter denied to her an education opportunity contrary to the Indiana Civil Rights Law and is entitled to damages sufficient to compensate her for the harm Ritter's discriminatory acts caused her.

Appellant's App. p. 62-71.

On November 15, 2013, oral argument was held before the ICRC, and on December 30, 2013, the ICRC adopted ALJ Allen's Proposed Findings of Fact, Conclusions and Order. The ICRC also reduced the monetary award from $75,000 to $25,000, which it stated was an award for emotional distress.

Ritter now appeals.

When reviewing a decision of an administrative agency, we apply the same standard as the trial court. Ind. Dep't. of Natural Res. v. Hoosier Envtl. Council, Inc., 831 N.E.2d 804, 808 (Ind. Ct. App. 2005). We will reverse the Board's order only if it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to a constitutional right, power, privilege or immunity; (3) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence." Id. at 809; Ind. Code § 4-21.5-5-14(d)(1)-(5). We give deference to the expertise of the agency and will not reverse simply because we may have reached a different result than the Commission. Ind. Civil Rights Comm'n v. Adler, 714 N.E.2d 632, 635 (Ind. 1999). The burden of demonstrating the invalidity of an action is on the party challenging its validity. Ind. Code § 4-21.5-5-14(a). An interpretation of statutes and regulations by the administrative agency charged with enforcing those statutes and regulations is entitled to great weight, Ind. Dept. of Envtl. Mgmt. v. Steel Dynamics Inc., 894 N.E.2d 271, 274 (Ind. Ct. App. 2008).

## I. Jurisdiction

At the outset, we address Bullock's contention that Ritter has waived its jurisdictional arguments. Bullock argues that Ritter may not assert lack of jurisdiction when it failed to do so in its objections to the findings of fact and conclusions of law. However, while Bullock is correct that generally, when an ALJ has issued a non-final

10

order recommended for adoption by the ICRC, issues are only preserved by assertion of objections to the recommendation under Indiana Code section 4-21.5-3-29, subject matter jurisdiction may not be waived or conferred by agreement, and may be raised by the parties at any time, including on appeal. Weldon v. Universal Reagents, Inc., 714 N.E.2d 1104, 1107 (Ind. Ct. App. 1999). Therefore, Ritter has not waived its jurisdictional arguments.

Turning to the merits, we address the issue of whether the ICRL applies to Bullock's claim. Ritter challenges ALJ Allen's conclusion that the ICRC has jurisdiction over Ritter because participation on the girls' varsity basketball team at Ritter "relates to" education under Indiana Code section 22-9-1-3(l).

The goal of statutory construction is to determine, give effect to, and implement the intent of the legislature. Sales v. State, 723 N.E.2d 416, 420 (Ind. 2000). The best evidence of legislative intent is surely the language of the statute itself, and courts strive to give the words in a statute their plain and ordinary meaning. A statute should be examined as a whole, avoiding excessive reliance upon a strict literal meaning or the selective reading of individual words. Prewitt v. State, 878 N.E.2d 184 (Ind. 2007).

The purpose of the ICRL is "[t]he promotion of equal opportunity without regard to race, religion, color, sex, disability, national origin, or ancestry through reasonable methods." Ind. Code § 22-9-1-2(b). This aligns with the public policy underlying the statute:

It is the public policy of the state to provide all of its citizens equal opportunity for education, employment, access to public conveniences and accommodations, and acquisition through purchase or rental of real property, including but not limited to housing, and to eliminate segregation or separation based solely on race, religion, color, sex, disability, national origin, or ancestry, since such segregation is an impediment to equal opportunity. Equal education and employment opportunities and equal access to and use of public accommodations and equal opportunity for acquisition of real property are hereby declared to be civil rights.

I.C. § 22-9-1-2(a).

In order to effect the purpose and policies underlying the ICRL, discriminatory practices are prohibited. The ICRL defines discriminatory practice as follows:

(1) the exclusion of a person from equal opportunities because of race, religion, color, sex, disability, national origin, ancestry, or status as a veteran;

(2) a system that excludes persons from equal opportunities because of race, religion, color, sex, disability, national origin, ancestry, or status as a veteran;

(3) the promotion of racial segregation or separation in any manner, including but not limited to the inducing of or the attempting to induce for profit any person to sell or rent any dwelling by representations regarding the entry or prospective entry in the neighborhood of a person or persons of a particular race, religion, color, sex, disability, national origin, or ancestry; or

(4) a violation of IC 22-9-5 that occurs after July 25, 1992, and is committed by a covered entity (as defined in IC 22-9-5-4).

I.C. § 22-9-1-3(l). That section further states that "[e]very discriminatory practice relating to the acquisition or sale of real estate, <u>education</u>, public accommodations, employment, or the extending of credit . . . shall be considered unlawful unless it is specifically exempted by this chapter." Id. (emphasis added).

12

Ritter argues that to construe membership on the extracurricular girls' basketball team at a private, religious high school as within the ICRC's jurisdiction is "contrary to the language and structure of the statute and creates absurd results." Appellant's Br. p. 8. Specifically, Ritter argues that the ICRC's finding that it had jurisdiction over extracurricular activities at Ritter because Ritter engages in activities relating to education is inconsistent with the statute as a whole. As support for this argument, Ritter points to the exclusion of "any school, educational, or charitable religious institution owned or conducted by or affiliated with a church or religious institution" from the definition of "employer" for purposes of employment discrimination. I.C. § 22-9-1-3(h). Ritter implies that the legislature's decision to exempt private, religious institutions from the definition of "employer" evidences an intent to exempt the same from the jurisdiction of the ICRL for purposes of discrimination relating to education.

However, we find that a plain reading of the statute renders Ritter's interpretation untenable. First, we note that the legislature explicitly indicated that the ICRL "shall be construed broadly to effectuate its purpose." I.C. section 22-9-1-2(g). Second, the ICRL clearly states that "[e]very discriminatory practice relating to the acquisition or sale of real estate, education, public accommodations, employment, or the extending of credit . . . shall be considered unlawful <u>unless it is specifically exempted</u> by this chapter." I.C. § 22-9-1-3(l) (emphasis added). The legislature chose to exempt private, religious institutions from the ICRC's jurisdiction with regard to employment discrimination complaints; they did not choose to provide the same exemption for discrimination

13

"relating to . . . education." Id. Therefore, we find that membership on the girls' varsity basketball team at Ritter relates to education under the statute and Bullock's complaint comes within the jurisdiction of the ICRC.

## II. Constitutional Claims

Ritter also contends that to affirm the ALJ's determination that the ICRC has jurisdiction over Ritter because participation on the girls' varsity basketball team at Ritter relates to education would violate Ritter's rights to religious liberty and expressive association under both the United States Constitution and the Indiana Constitution.

In support of this argument, Ritter points us to N.L.R.B v. Catholic Bishop of Chicago, 440 U.S. 490 (1979), in which the United States Supreme Court determined that the National Labor Relations Board could not exercise jurisdiction over teachers in religiously operated institutions because such exercise would violate the guarantees of the religion clauses of the First Amendment. In that case, the Supreme Court focused on "the unique role of the teacher in fulfilling the mission of a church operated school," and the "importance of the teacher's function in a church school." Id. at 501. The opinion focused on the church-teacher relationship and cited concerns regarding the religious entanglement that might result when the Board might be asked to investigate claims of unfair labor practices where a religious school claimed that such practices were mandated by religious creeds; the Court stated that an inquiry into those claims would "necessarily involve inquiry into the good faith of the position asserted by clergy administrators and its relationship to the school's religious mission." Id. at 502.

14

This case does not involve employment; if it did, Ritter would be exempted by the ICRL. I.C. § 22-9-1-3(h). Rather, this case involves Bullock's claim that she was excluded from an opportunity related to education and discriminated against on the basis of her race. To affirm the determination of the ALJ and award Bullock damages for emotional distress does not implicate interference with the religious creed of the Roman Catholic faith. Therefore, Ritter's reliance on N.L.R.B v. Catholic Bishop of Chicago is misplaced.

Ritter next argues that the United States Supreme Court has recognized that forbidding "interference in matters concerning religious doctrine and organization and by dictating neutrality on the part of our courts" allows religious organizations to determine matters of church government, faith, and doctrine without State interference. Appellant's Br. p. 14. Ritter cites several cases to support this principle.

However, none of the cases cited by Ritter have bearing on the instant case. In Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America, the United States Supreme Court determined that a New York statute that attempted to transfer control of churches violated the free exercise clause of the First Amendment. 344 U.S. 94 (1952). In Kreshik v. Saint Nicholas Cathedral, the United States Supreme Court dismissed a complaint asking the Court to determine the right to use and occupancy of a Cathedral as the question was strictly a matter of ecclesiastical government. 363 U.S. 190 (1960). The Supreme Court of Maine held that the First Amendment barred a husband and wife's negligent supervision complaint against a priest from whom they had

15

received marriage counseling in <u>Swanson v. Roman Catholic Bishop of Portland</u>, 692 A.2d 441 (Me. 1997). In <u>Pentecostal Tabernacle of Muncie v. Pentecostal Tabernacle of Muncie</u>, this Court determined that to decide who was right between two disputing religious factions would constitute an interference with religious freedom. 146 N.E.2d 573, 128 Ind. App. 145 (Ind. Ct. App. 1957). And in <u>McEnroy v. St. Meinrad School of Theology</u>, this Court found that resolving a terminated professor's contract claims would excessively entangle the Court in religious affairs. 713 N.E.2d 334 (Ind. Ct. App. 1999).

All of the above cases cited by Ritter deal with administrative/teaching functions or ecclesiastical government; they deal directly with matters of faith and creed. The case before us involves a complaint of racial discrimination against a student who wished to be admitted to play on the girls' varsity basketball team. We do not find that Ritter's rights under either the United States Constitution or the Indiana Constitution are implicated here.

III. Procedural Issues

While we find that the ICRC did have jurisdiction over the girls' basketball team at Ritter, we must address the serious procedural inadequacies that present themselves in this case.

First, it is evident from the record that the ICRC took an inordinate amount of time to perform its statutory duties. Bullock was denied admission to the girls' basketball team in the fall of 2007. Appellant's App. p. 63. Her mother filed a claim with the ICRC in January 2008. <u>Id.</u> at 1. In May 2012, the same year that Bullock's high school class

16

graduated from college, the matter was heard by an ALJ. Id. at 61. Then in July 2013, more than a full year after the evidentiary hearing, a different ICRC ALJ issued its Proposed Findings of Facts, Conclusions and Order, which were amended and adopted by the ICRC on December 30, 2013, more than six years after Bullock was cut from the girls' basketball team. Id. at 61-62. We find that such a delay cannot be considered appropriate.

Second, the procedure utilized by the ICRC was deficient. Courts that review administrative decisions are prohibited from reweighing the evidence or judging the credibility of witnesses and must accept the facts as found by the administrative body. Natural Res. Comm'n v. Sugar Creek Mobile Estates, 646 N.E.2d 61, 64 (Ind. Ct. App. 1995). This prohibition arises from the fact that the administrative agency, through its duly appointed ALJ, is the party who heard directly the witnesses' testimony, observed their demeanor, and determined their credibility.

Here, the ALJ who heard the witnesses' testimony retired six months after the hearing in this matter and did not enter proposed findings. Then, a different ALJ, who did not hear the parties' testimony, did not observe their demeanor, and did not make any credibility determinations based on what she heard or observed, entered the Proposed Findings of Fact, Conclusions and Order. Therefore, in entering the proposed findings, the ALJ was weighing evidence that she did not hear and determining the credibility of witnesses that she did not see.

17

As the ALJ entered her Proposed Findings of Fact, Conclusions and Order without personally observing the demeanor of the witnesses, she was effectively in the same position this Court usually holds as a reviewing court. We have previously held that, when examining "cold evidence," a reviewing court may "assess independently this evidence without invading the province of the trial court." State v. Bisard, 973 N.E.2d 1229, 1237 (Ind. Ct. App. 2012) (holding that an independent assessment of blood evidence was appropriate); See also Bunch v. State, 964 N.E.2d 274, 293 (Ind. Ct. App. 2012) (holding that it was not necessary to defer to the post-conviction court's assessment of expert's scientific evidence where the assessment was not based on demeanor but on evidence that was also in front of the appellate court). However, in Bisard and Bunch, the evidence to be examined did not involve credibility; if it had, "we would defer to the post-conviction court's assessment of fact witnesses." Id.

Here, the case hinges entirely on credibility. ALJ Allen found, as a conclusion of law, that Ritter's nondiscriminatory explanation for cutting Bullock from the team–that Bullock was not admitted to the team on a limited-play basis because she did not get along with the other girls–was a pretext for discrimination. ALJ Allen also found that, because Clark's explanation to Bullock's parents regarding Bullock's exclusion from the team cited other reasons, and did not include information about Bullock's ability to get along with other members of the team, such a reason was a pretext. Id.

The danger inherent in the issuance of an order by an ALJ who did not hear the evidence and must make credibility determinations becomes apparent when one looks to

18

the record in this case, which shows that ALJ Allen erroneously determined that Ritter proffered the explanation that Bullock did not get along with other players as a nondiscriminatory purpose for cutting Bullock from the girls' varsity basketball team. Clark and the other coaches made two decisions concerning Bullock. First, the coaches determined which of the forty-one girls who tried out for the varsity team should be cut. Administrative Hearing Tr. p. 277. After they made cuts, they determined which of the girls who had been cut would be suitable to be members of the team on a limited-play basis, wherein they would perhaps get limited playing time or help the team in other ways. Id. at 277, 282.

The record shows that when considering the first decision, whether to cut Bullock from the team, Clark and the other coaches never mentioned that she did not get along with other girls. Rather, they gave the reasons which he cited to her parents–that Bullock was not improving as quickly as some of the girls, that he questioned her commitment to the team due to her failure to participate in summer workouts and conditioning, and that choosing younger players who were playing at or beyond Bullock's level was a better decision for the team's future. Id. at 201, 209, 213, 217, 218, 223, 233, 252, 257.

Once Clark and the other coaches had determined which girls to cut from the team, they then considered whether to allow some of the girls to play on a limited-play basis. It was when making this second decision that it was determined that Bullock's issues with Lynch and other teammates might make for bad team chemistry and that Bullock was unlikely to be happy playing in a limited capacity. Id. at 277 – 284. The

19

record shows that Clark understood that, when he cited team chemistry as a reason for excluding Bullock from the team in a limited-play capacity, he was looking at a separate decision from allowing her on the team in a full capacity. Indeed, Clark testified that he made a determination regarding limited-play membership "for all the girls that we cut." Id. at 282.

Therefore, two separate sets of nondiscriminatory reasons were provided for two distinct sets of decisions. The nondiscriminatory purpose underlying the decision not to allow Bullock on the team in a limited-play capacity was not a pretext for discrimination. A separate nondiscriminatory purpose was set forth for cutting Bullock from the team in a full-capacity role.

We find that when, as here, a case hinges entirely on credibility, the issuance of an order by an ALJ who did not hear the evidence or observe the witnesses is not in accordance with law, is contrary to the constitutional rights of the parties, and is without observance of procedures required by law. Therefore, we vacate the order of the ICRC and remand with instructions to conduct a new hearing and issue a timely ruling.

The judgment of the ICRC is vacated and remanded.

KIRSCH, J., and ROBB, J., concur.